UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SHA-HEED RAHMAN,

                            Plaintiff,

        -against-                                    9:10-CV-1496 (LEK/TWD)

BRIAN FISCHER; KENNETH S.
PERLMAN; HULIHAN; K. PHILLIPS;
IMAM MONTIERO; S.A. CONNELL;
JOSLYN; ADAMIK; SHARROW; and
ALBERT PRACK,

                            Defendants.

_____


## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

        In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff Sha-

Heed Rahman ("Plaintiff"), a Shiite[1] Muslim in the custody of the New York Department of

Corrections ("DOCS"),[2] alleges that Defendants violated a settlement agreement, retaliated against

Plaintiff, and conspired to punish him for pursuing his First Amendment rights to exercise his

religion and access the courts.  Dkt. No. 1 ("Complaint").  Currently pending before the Court is

Defendants' Motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b).  Dkt. No. 27

_____

        [1]  The term "Shiite" is spelled in several different ways in the record.  The Court, in the style
of the Associated Press, will use "Shiite" unless quoting material that uses an alternate spelling.

        [2]  On April 1, 2011, DOCS merged with the Division of Parole to form the Department of
Corrections and Community Supervision.  The events giving rise to Plaintiff's complaint occurred
before the merger and the Court will therefore refer to the agency by its former name.

("Motion"). For the reasons that follow, Defendants' Motion is granted.[3]

## II.     BACKGROUND

The following facts are taken from Plaintiff's Complaint, the attachments thereto, and documents of which the Court may take judicial notice.[4]

Until approximately ten years ago, DOCS did not officially recognize the doctrinal differences between Shiite and Sunni Muslims. In 1998, a Shiite inmate filed a grievance asking for separate study meetings, classes, or study groups for Shiite inmates. Compl. at 122. DOCS's Central Office Review Committee ("CORC") denied the grievance, stating that "CORC has been advised by the Department's Imam that all Muslim religious groups fall under Islam, with the exception of the . . . Nation of Islam. All practice the same faith and should not be separated, as the grievant suggests." Id.

The inmate challenged CORC's determination in the state courts of New York. Id. The state trial court concluded that CORC's decision was arbitrary and capricious because of the significant differences between Sunni and Shiite historical and doctrinal beliefs and religious practices. Id. at 124-25. The court ordered the Commissioner of DOCS to permit Shiite inmates to

---

[3] Because the Complaint is subject to dismissal on other grounds, the Court does not address Defendants' arguments regarding qualified immunity, the Eleventh Amendment, or New York Correction Law § 24. Dkt. No. 27-1 at 17-22.

[4] Defendants have attached many exhibits to their Motion to dismiss. The Court has not considered those documents, with the exception of documents in Exhibits A (Dkt. No. 27-2 at 52-59), B (Dkt. No. 27-2 at 61-64), G (Dkt. No. 27-2 at 76-128) and H (Dkt. No. 27-2 at 129-208), of which the Court can take judicial notice because they are court records, because Defendants have not moved for summary judgment. The Court declines to convert the motion *sua sponte*. Cf. Cleveland v. Caplaw Enterprises, 448 F.3d 518, 521 (2d Cir. 2006) (courts have discretion not to consider extrinsic evidence attached to motions to dismiss that might convert such a motion to one for summary judgment).

have contact with a volunteer Shiite scholar and, if no such volunteer was available, to allow Shiite inmates to participate in a religious education class or study group. Id. at 125. The Commissioner appealed.

The New York state appellate court affirmed the decision of the lower court but modified the judgment. Cancel v. Goord, 717 N.Y.S.2d 610 (N.Y. App. Div. 2000). The appellate court agreed that in "light of the overwhelming evidence in the record that significant dogmatic differences separate the two Muslim communities . . . the denial of the grievance was arbitrary and capricious." Id. at 612. However, the appellate court stated that "religious freedom within a prison cannot be unfettered" and "must be balanced against security considerations and the State's legitimate correctional goals." Id. (citations omitted). Therefore, the appellate court modified the judgment to delete the portions of the order that "directed the manner in which [DOCS] was to permit the petitioner and his fellow adherents of the Shi'a sect of Islam to practice their faith." Id. The appellate court remitted the matter to DOCS "to conduct administrative proceedings, with Shi'a participation, to determine the manner in which best to afford Shi'a inmates separate religious services, under appropriate Shi'a leadership, in a time and place that comports with legitimate penological concerns." Id. The New York Court of Appeals denied leave to appeal. Cancel v. Goord, 96 N.Y.2d 707 (N.Y. 2001).

On August 6, 2001, DOCS issued a protocol regarding religious practices and programming for Shiite Muslim inmates. Compl. at 129, 131-33. As is pertinent here, the protocol stated that:

> Shi'ite Muslim inmates shall have the same rights as all other inmate faith groups to attend Shi'ite Muslim religious education and study classes. These Shi'ite Muslim education and study classes may utilize Shi'ite Muslim inmate facilitators in the same manner and to the same extent as other religious education class programs . . . .

> Shi'ite Muslim inmates shall be afforded the full and equal opportunity to participate in, without discrimination, the weekly Friday Juma service for all Muslim inmates of a particular correctional facility. Shi-ite Muslim Chaplains, whether they be employees or outside volunteers, shall be entitled to officiate at the weekly Juma services in the same manner as any other Muslim chaplain or outside volunteer Chaplains. In any facility in which Shi'ite Muslim inmates are present in the general population, the Muslim Chaplain of that facility shall ensure that the Muslim Majlis shall have at least one Shi'ite Muslim member . . . .
>
> The Department shall revise its Religious Observance Calendar . . . to include observances unique to Shi'ite Muslims, namely the observances of Ashura and the Id-ul-Ghadeer Khum.

Id. at 132-33.

In 2004, Plaintiff brought a civil rights lawsuit against DOCS officials in the Western District of New York. Rahman v. Goord, No. 04-CV-6368, 2007 WL 1299408 (W.D.N.Y. May 3, 2007). Plaintiff alleged that DOCS was violating the 2001 protocol by employing only Sunni chaplains at DOCS facilities and not allowing inmates to observe Shiite holy days. Id. at *2. Plaintiff also alleged that the protocol itself was invalid because it failed to provide for separate Shiite Jumah services and therefore violated the ruling in Cancel v. Goord. Id.

The parties engaged in settlement negotiations. Plaintiff alleges that on or about December 26, 2009, Defendant Brian Fischer, Commissioner of DOCS, offered to send Plaintiff to Mid-State Correctional Facility, where Plaintiff would be able to participate in non-religious programming and attend a Shiite Jumah service. Compl. at 9, 10. Plaintiff told his attorney that he would agree to sign the settlement agreement, so long as he was allowed to participate in specific non-religious programming. Id. at 10. Plaintiff alleges that "had DOCS stated they would transfer me from Mid-State within thirty (30) days I would not have agreed to sign the stipulation and requested to go to trial." Id. at 10-11. On January 14, 2010, Plaintiff was transferred to Mid-State. Id. at 32.

4

The Rahman v. Goord litigation was terminated by stipulation of settlement on January 28, 2010. Dkt. No. 27-2 at 52-59.[5] Under the Agreement, DOCS agreed to provide Plaintiff an alternate Shiite Jumah service. Id. ¶ 5. In order for the service to be held, "a minimum of five (5) self-identified Shiite Muslims . . . must be available and desirous of availing themselves of the alternative Shiite Jumah service." Id. ¶ 5(c). The Agreement did not discuss Shiite study classes or groups. The Agreement stated that it embodied "the entire agreement of the parties in this matter and no oral argument [sic] entered into at any time nor any written agreement entered into prior to the execution of this private settlement and its approval by the Court regarding the subject matter of the instant proceedings, shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein." Id. ¶ 9. Under the Agreement, Plaintiff agreed not to commence any court, arbitration, or administrative action pertaining to the same facts as the Rahman v. Goord litigation. Id. ¶ 1. However, Plaintiff retained the right to enforce the settlement Agreement. Id.

Plaintiff alleges that when he arrived at Mid-State, a lieutenant told him that Defendant Superintendent Hulihan and Defendant Deputy Superintendent of Programs K. Phillips did not want to have two Muslim services. Compl. at 10, 14.

Plaintiff's request for Shiite study classes was also denied. Defendant Fischer, through Defendant Deputy Commissioner Kenneth S. Perlman, informed Plaintiff that the Rahman v. Goord settlement stated that "to have Shiite Islamic study classes there must be 5 registered Shiite Muslims." Id. at 10. Plaintiff alleges that "certainly Mr. Fis[c]her knew that Rahman v. Goord . . .

---

[5] The copy of the settlement Agreement supplied by Defendants does not contain the Judge's signature. The Court has viewed the docket of the Western District of New York case via PACER. The version of the settlement Agreement on the Western District's docket is signed and is identical in all other respects to the document provided by Defendants. Rahman v. Goord, No. 04-CV-6368, Dkt. No. 97 (W.D.N.Y. Jan. 28, 2010). For the ease of the parties, this Memorandum-Decision and Order will cite the version provided by Defendants.

does not speak about Islamic classes so he added that position to the stipulation which I did not agree to." Id. Plaintiff filed a grievance, which Defendant Phillips denied. Id.

Plaintiff also alleges that when he arrived at Mid-State, his counselor told him that he would have to wait until 2011 to begin the non-religious programming that he had requested. Id. at 12. Plaintiff alleges that Defendant Phillips told the counselor "not to enroll me in my programs because I'll be gone." Id. at 16. Plaintiff alleges that Defendant Hulihan knew that Plaintiff should have been enrolled in the non-religious programming. Id. at 14-15.

Plaintiff alleges that after he arrived at Mid-State he sent a letter to Defendant Hulihan expressing his desire to establish a Shiite Islamic class and requesting funds to purchase books. Id. at 14. Defendants Hulihan and Phillips denied the request because "they both felt that [the settlement agreement in] Rahman v. Goord . . . states you must have (5) people to have Shiite Islamic classes." Id. Plaintiff argued that the settlement agreement "speaks only of Jumah service," but Defendants Hulihan and Phillips denied the grievance "even though they knew they were wrong." Id.

Plaintiff alleges that on February 7, 2010, Defendant Fischer conspired with Defendants Phillips and Hulihan to give Plaintiff "a dirty urine test result to prevent Shiite Jumah services" and classes. Id. at 9, 12. Plaintiff alleges that "the officer taking my urine stated that I will have a positive return test and [be] sent to the box."[6] Id. at 14.

On the day of the urine test, Plaintiff filed a grievance complaining that his urine sample had been mislabeled. Id. at 35, 37. He alleged that the mislabeling may have been in retaliation for the Rahman v. Goord settlement. Id. The Inmate Grievance Resolution Committee ("IGRC") denied

---

[6] Inmates who are sent to the Special Housing Unit ("SHU" or "the box") for disciplinary reasons lose many privileges, including some varieties of religious observance.

Plaintiff's grievance.  Id. at 36.  The IGRC stated that:

> the officer collecting the urine samples has gone on record and admitted to inadvertently mixing up the collection container, corrected the error and both samples tested negative.  The status of grievant's lawsuit was unknown to security personnel at submission of names for random urinalysis testing.

Id.

Plaintiff alleges that Defendant Imam Montiero, the Imam at Mid-State, conspired with the other Defendants to deny Plaintiff his religious rights in a variety of ways.  Id. at 18.  First, Plaintiff alleges that Defendant Montiero refused to establish a Shiite study class or a book locker for Shiite texts because there were not five registered Shiite Muslims at Mid-State.  Id.  Plaintiff informed Defendant Montiero that neither the 2001 Shiite protocol nor the settlement Agreement in Rahman v. Goord required that there be five Shiites for classes or lockers.  Id.  Rather – Plaintiff informed Defendant Montiero – the five-Shiite requirement applied only to Jumah services.  Id.  Second, Plaintiff alleges that Defendant Montiero tried to convince inmates not to register as Shiites.  Id. Specifically, Plaintiff alleges that when Defendant Montiero, at the behest of Defendant Phillips, interviewed one inmate who wanted to self-identify as Shiite, Defendant Montiero "decided to convince [the inmate] that being Muslim is not for him . . . because [he] is white."  Id.  Third, Plaintiff alleges that Defendant Montiero allowed his inmate facilitator to make disparaging remarks about Shiite Muslims on the day of Jumah.  Id.

On February 9, 2010, Plaintiff wrote to the Inmate Grievance Program ("IGP") complaining that he had been told that once the mess hall ran out of the alternative meal they would no longer provide it.  Id. at 40.  Plaintiff asked that the facility create a system that would ensure that inmates who do not eat meat or fish for religious reasons would be able to receive an alternative meal.  Id.

7

On February 10, 2010, Plaintiff wrote to Defendant Fischer complaining about the unavailability of alternative meals. Id. at 41-42. Deputy Commissioner Gayle Haponik responded on behalf of Defendant Fischer. Id. at 50. Ms. Haponik stated that "[t]he regional coordinator spoke with the food service administrator and he has reported that they are providing an alternative when it is on the menu. If they run out of the alternative, an appropriate substitution will be made. In the future, if the main entree is tuna fish, and they run out of cheese as the alternative, an appropriate substitution will be made for the cheese." Id. at 50.

On February 10, 2010, Plaintiff wrote to the IGP complaining that Defendants Hulihan and Phillips were misapplying the 2001 protocol regarding Shiite Muslim inmates. Id. at 43-44. Plaintiff explained that Shiite classes and books needed to be provided even if there were not five Shiite Muslims in the facility. Id. at 43. He stated that other facilities provided classes and books despite having fewer than five registered Shiite Muslims. Id. Plaintiff requested a classroom with a secure book locker. Id. at 44.

On February 19, 2010, Plaintiff wrote to the IGP again requesting Shiite classes and books. Id. at 45, 47-49. The IGP denied Plaintiff's grievance. Id. at 46. The IGP stated that "educational classes for the Shi'ite Muslim faith will be determined by the number of practicing Shi'ite Muslims currently housed at the facility . . . [T]his facility has established five (5) as the number of registered Shi'ite Muslims prior to implementing educational classes." Id. at 46.

Plaintiff alleges that Defendants Perlman and Fischer prevented Plaintiff from practicing his faith "by ordering that [Plaintiff] be transferred from Mid-State Correctional Facility to Oneida Correctional Facility . . . after [Plaintiff had] gotten six inmates at Mid-State Correctional Facility to self-identify as Shia Muslims." Id. at 13, 15. Plaintiff alleges that "they had no reason to transfer

me to Oneida Correctional Facility." Id. at 15. On February 22, 2010, Plaintiff was transferred to

Oneida Correctional Facility. Id. at 82.

Plaintiff alleges that on or about March 2, 2010, a lieutenant at Oneida stopped him and told

him not to unpack his property. Id. at 19. Plaintiff immediately spoke with Oneida's Sunni Islamic

Chaplain, who assured Plaintiff that he would express Plaintiff's concerns to Defendant S.A.

Connell (Oneida's Superintendent) and Defendant Deputy Superintendent of Programs Joslyn. Id.

At Oneida, Plaintiff was told by an unnamed unit officer that he could not use the bathroom

sink to make absolution for prayer. Id. Plaintiff wrote a complaint to Defendant Fischer because

morning prayer was at approximately 5:00 a.m., and the officer stated that Plaintiff must wait until

6:30 a.m. to wash, which would make Plaintiff miss his prayer. Id. In response, Defendant Perlman

stated that "I have been informed that this matter has been resolved due to the recent time change to

Daylight Savings Time, which allows you access to water for your religious obligations and

coincides with facility operations at Oneida Correctional Facility." Id. at 68. Plaintiff alleges that

"daylight savings time still did not allow me access to water." Id. at 19.

On March 29, 2010, Defendant Correction Officer Sharrow issued a misbehavior report

charging Plaintiff with possessing an item that may be classified as a weapon or dangerous

instrument and possessing an altered item. Id. at 55. The misbehavior report stated that:

> On the above date & time I CO Sharrow was conducting a cube search
> on inmate Rahman 90A0409. I tipped his large locker over and found
> a metal can lid bent over underneath it. Area supervisor was then
> notified. Contraband was then placed in the contraband locker shelf #2.
> Cube search authorized by Sgt. Reynolds.

Id.

Plaintiff alleges that Defendant Sharrow was not assigned to his housing unit, but had been

9

told by Defendant Captain Adamik and a non-defendant sergeant to say that he found the can lid in Plaintiff's cell so that Plaintiff would be sent to the SHU and out of Oneida. Id. at 23. Plaintiff alleges that Defendant Sharrow issued the misbehavior report and a contraband receipt "so that th[ere] will not be a Shiite Jumah prayer service with [Plaintiff] in the box." Id. Plaintiff alleges that Defendant Sharrow's bad faith is demonstrated by the fact that the locker had been searched three other times by two different officers who never found a can lid. Id.

Defendant Adamik served as the hearing officer at the disciplinary hearing on the misbehavior report. Id. at 56 Plaintiff asserts here, as he did at the time of the hearing, that Defendant Adamik violated DOCS regulations by waiting too long after the misbehavior report to commence the hearing. Id. at 22. Plaintiff alleges that when he raised the issue at the hearing, Defendant Adamik said he could do as he pleased. Id. Defendant Adamik noted that Plaintiff liked litigating and said the delay would give Plaintiff another issue to argue. Id. Plaintiff alleges that Defendant Adamik told Plaintiff off the record that Defendant Connell did not want another group of Muslims having services in her jail and that the only way to ensure that Plaintiff would leave the jail was to have Defendant Sharrow say he found a can lid under Plaintiff's locker. Id.

At the hearing, Defendant Adamik considered Defendant Sharrow's written report, Plaintiff's testimony that the can lid was not his and that he had a medical history indicating that he would not be able to lift the locker easily, an unusual incident report, photographs of the can lid and the can lid itself, testimony by four inmate witnesses on Plaintiff's behalf, and the testimony of Defendant Sharrow. Id. at 57-58.

Defendant Adamik found Plaintiff guilty and sentenced Plaintiff to five months in the SHU, six months loss of recreation, commissary, and phone privileges, seven months loss of package

privileges, and four months loss of good time credits. Id. at 56. Defendant Adamik stated that his reason for the guilty disposition was that "possession of contraband is a serious matter. The can lid was fashioned so as to be easily used as a weapon. All [inmates] are responsible for contents of their cube areas. The misbehavior report clearly indicates that the can lid was found in [Plaintiff's] assigned cube. The disposition is intended to impress upon [Plaintiff] that this behavior will not be tolerated in a correctional facility." Id. at 57.

Plaintiff appealed Defendant Adamik's decision. Id. at 60-63  Plaintiff argued that Defendant Adamik was biased and that the hearing was untimely. Id.  Plaintiff further argued that Defendant Sharrow framed him in order to deny him the opportunity to practice his faith. Id. at 62-63.

Plaintiff filed a supplemental appeal on April 15, 2010. Id. at 64-66.  There, Plaintiff complained that his settlement Agreement stated that he would be sent to Mid-State, enrolled in non-religious programming, and provided an alternative Shiite Jumah service but that when he got six other inmates to self-identify as Shiite Muslims "agents of DOCS tried to give [him] a dirty urine and have [him] sent to the box." Id. at 64.  Plaintiff stated that when another inmate self-identified as a Shiite, the can lid was placed under Plaintiff's locker. Id.  Plaintiff stated that Defendant Sharrow was not even assigned to Plaintiff's dorm when Defendant Sharrow found the can lid. Id. at 66.  Plaintiff alleged that Defendant Adamik never gave him a copy of the unusual incident report and further alleged that Defendant Adamik said that the facility would not have two Muslim groups. Id. at 65-66.

Plaintiff filed another supplemental appeal on April 24, 2010. Id. at 67.  Plaintiff stated that he had been given an opportunity to listen to the hearing tape and that Defendant Adamik had erased

a part of an inmate's testimony. Id. That inmate testified that several inmates had dropped can lids

in the area. Id. Plaintiff stated that Defendant Adamik was biased because he directed Defendant

Sharrow not to respond when Plaintiff asked "as a professional do you think it logical for a person

with no history of drugs or weapons on his record in 23 years to leave a can lid under his own locker

when he knows they search his cube every 12 to 16 days." Id. at 67. Defendant Albert Prack

affirmed Defendant Adamik's decision on May 19, 2010. Id. at 59. Plaintiff alleges that Defendant

Prack conspired to keep Plaintiff in the SHU by failing to review the tape of Plaintiff's hearing

before affirming the decision. Id. at 24. Plaintiff alleges that Defendant Prack did so to prevent

Plaintiff from practicing his religion. Id.

Plaintiff subsequently filed a state court action involving some of the same facts involved in

this action. Id. at 7; Rahman v. Fischer, No. 4005-10 (Albany County Supreme Court). In that

action, Plaintiff challenged the results of the disciplinary hearing that Defendant Adamik had

conducted. Dkt. No. 27-2 at 86. Plaintiff argued that the hearing was started in an untimely manner

and that Defendant Adamik erased a portion of the hearing tape in which a witness testified that "he

knew other inmates dropped can lids and some went under [Plaintiff's] locker." Id. at 95, 98.

Plaintiff requested that the misbehavior report be expunged from his record. Id. at 98. Plaintiff's

Petition did not mention Plaintiff's religious complaints, but attachments to the Petition included

grievances mentioning the issue. Id. at 114. In response, Defendant Fischer argued that Defendant

Adamik was impartial, that the hearing was timely commenced and concluded, and that the hearing

was completely recorded. Id. at 135-43. The response did not mention Plaintiff's religion or any

issues associated with it, although attachments to the response included grievances mentioning the

issue. Id. at 187.

The state court entered judgment in favor of the defendants.[7]  Compl. at 8.  The court held

that the record failed to show that Defendant Adamik violated DOCS regulations regarding the

timing of the disciplinary hearing.  Dkt. No. 27-2 at 62.  In addition, the court noted that "the time

limits imposed by the regulations are directory, not mandatory," and thus Plaintiff would have had

to demonstrate substantial prejudice even if the regulations were violated.  Id.  The court stated that

Plaintiff has failed to suggest any prejudice to himself by the delay."  Id. at 63.  The court rejected

Plaintiff's arguments regarding inmate testimony and the alleged erasing of the hearing tape.  Id.

The court found that Plaintiff had failed to establish that the disciplinary determination was

arbitrary, capricious, or illegal or that he was denied a fair and impartial determination and/or due

process.  Id.

Plaintiff now alleges that Defendants attempted to prevent him from filing the instant lawsuit

by denying him the right to file grievances.  Compl. at 15-17.  However, the record is replete with

grievances that Plaintiff filed regarding the issues in this lawsuit.  Id. at 34-119.  Defendants do not

argue in their Motion to dismiss that Plaintiff failed to exhaust his administrative remedies.

Plaintiff filed this action in the Western District of New York on October 13, 2010.  Id.  It

was transferred to this District because Mid-State and Oneida are located in the Northern District of

New York.  Dkt. No. 4.  In this action, Plaintiff seeks: (1) an injunction "preventing DOCS and its

agents from violating the court order in Rahman v. Goord"; (2) a transfer to Mid-State so that he can

---

[7]  Defendants assert that the court's decision in Rahman v. Fischer is "an attachment to the
Complaint."  Dkt. No. 27-1 at 4.  The copy of the Complaint that was electronically filed with this
Court does not include a copy of the Rahman v. Fischer decision.  However, Defendants have
attached a copy to their moving papers.  Dkt. No. 27-2 at 61-64.  The Court may take judicial notice
of the state court's order to recognize the judicial act that the order represents and the subject matter
of the litigation.  See City of Amsterdam v. Daniel Goldreyer, Ltd., 882 F. Supp. 1273, 1279
(E.D.N.Y. 1995) (citing United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994)).

participate in specified programming; (3) expungement of the misbehavior report from his record; and (4) five million dollars in damages. Id. at 29-30.

In July 2011, Plaintiff moved in the Western District of New York to reopen Rahman v. Goord on the grounds that DOCS had breached the settlement agreement. Rahman v. Goord, No. 04-CV-6368, Dkt. No. 100 (W.D.N.Y. Aug. 4, 2011). Specifically, Plaintiff alleged that DOCS was not providing him with a separate Shiite Jumah service and had improperly transferred him out of Mid-State. Compl. at 3. The United States District Court for the Western District of New York denied the motion both on subject matter jurisdiction grounds and under Federal Rule of Civil Procedure 60(b)(6). Rahman v. Goord, No. 04-CV-6368, Dkt. No. 100 (W.D.N.Y. Aug. 4, 2011).

Defendants now move to dismiss this action. Mot. Plaintiff has opposed the Motion. Dkt. No. 30 ("Response").

## III.    LEGAL STANDARD

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

## IV.    DISCUSSION

### A.  Violation of the Settlement Agreement

Plaintiff seeks an injunction "preventing DOCS and its agents from violating the court order in Rahman v. Goord." Compl. at 29. Defendants argue that this Court lacks subject matter jurisdiction to enforce the Rahman v. Goord settlement Agreement. Dkt. No. 27-1 at 4-6. The Court concludes that Defendants are correct.

"Ordinarily, construction and enforcement of private settlement agreements is a matter for the state courts." Lemus v. Manhattan Car Wash, Inc., No. 06 Civ. 15486, 2010 WL 1372705, at *3 (S.D.N.Y. Mar. 26, 2010).[8] Federal courts have ancillary jurisdiction over disputes involving settlement agreements only in limited circumstances. Id. Such circumstances may exist where "the parties' obligation to comply with the terms of the settlement agreement [is] made part of the order of dismissal – either by separate provision (such as a provision 'retaining jurisdiction' over the

---

[8] Defendants provided Plaintiff with a copy of this unpublished decision with their moving papers. Dkt. No. 27-2 at 7-21.

settlement agreement) or by incorporating the terms of the settlement agreement in the order."

Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 381 (1994).

Here, the settlement Agreement "so ordered" by the United States District Court for the Western District of New York did not contain any provision retaining jurisdiction. Dkt. No. 27-2 at 52-59. Although the agreement states that "*Plaintiff* retains the right to enforce this private settlement agreement," id. at 53 (emphasis added), the document does not make any reference to the *court* retaining jurisdiction. The language in the agreement indicates that the parties intended[9] the Agreement to be private rather than court-supervised. For example, the settlement Agreement is titled "Private Settlement Agreement" and includes the word "private" ten times in eight pages. Dkt. No. 27-2 at 52-59.

The issue is murkier regarding incorporation by reference. The court signed the actual settlement Agreement, albeit only after noting that it "approves this private settlement as to form only and it is so ordered." Id. at 59. The settlement Agreement was docketed as an "Order and Private Settlement Agreement." Rahman v. Goord, Dkt. No. 97 (W.D.N.Y. Jan. 28, 2010). The Western District's docket shows that there was no separate order or judgment dismissing the case.

The law is somewhat unsettled about whether a "so-ordered" settlement agreement like the one here is an 'incorporation of the settlement agreement in the order' such that the court retains ancillary jurisdiction under Kokkonen. Compare Torres v. Walker, 356 F.3d 238, 245 n.6 (2d Cir.

_____

[9] Regarding intent, Defendants argue that a "letter from [P]laintiff's attorney, that [P]laintiff provided with the Complaint, amply demonstrates that [P]laintiff was fully informed and apprised of the settlement conditions." Dkt. No. 27-1 at 5. The version of the Complaint that was electronically filed with this Court does not include any such letter. Defendants have provided the Court with a copy of the letter. Dkt. No. 27-2 at 71-72. The letter is not subject to judicial notice and the Court has not considered it.

2004) (suggesting that Supreme Court case law subsequent to <u>Kokkonen</u> "requires not only the physical incorporation of the settlement in a district court's order but also some evidence that a district court intended to place its 'judicial imprimatur' on the settlement"), <u>with</u> <u>Lemus</u>, 2010 WL 1372705, at *5 n.12 (characterizing as "incorrect" a party's argument that <u>Torres</u> held that "a federal court must review the terms of a settlement agreement before incorporating them into a stipulation and order of dismissal if it wishes to retain jurisdiction over the enforcement of the agreement").

When Plaintiff attempted to reopen <u>Rahman v. Goord</u> in the Western District of New York to enforce the settlement Agreement, the court found that its signature on the settlement agreement was insufficient to confer ancillary jurisdiction.   Specifically, the Honorable Charles J. Siragusa, United States District Judge for the Western District of New York, noted in his August 2, 2011 Order that:

> To the extent that Plaintiff is asking the Court to enforce the settlement agreement, the application must be denied because this Court lacks subject-matter jurisdiction to enforce the parties' settlement agreement. In that regard, it is well settled in this circuit that, under <u>Kokkonen</u> . . . , the district court can exercise ancillary jurisdiction to enforce a settlement agreement only if the dismissal order expressly retained jurisdiction over that particular agreement, or incorporated it into the order.   In this case, the Court did not expressly retain jurisdiction over the settlement agreement, nor did it incorporate the settlement agreement in its order.   Instead, the Court merely "so ordered" and approved the settlement agreement as to form.   Consequently, the matters raised in Plaintiff's motion amount to a claim for breach of contract, which must be pursued in state court.

<u>Rahman v. Goord</u>, Dkt. No. 100 (W.D.N.Y. Aug. 4, 2011) (citing <u>State Street House, Inc. v. New York State Urban Dev. Corp.</u>, 75 F. App'x 807, 810 (2d Cir. 2003)).

The Court need not resolve the issue of the Western District's jurisdiction definitively.   Even if, contrary to its own interpretation of the Agreement, the Western District had jurisdiction, nothing

suggests that *this* Court has jurisdiction. Therefore, Plaintiff's claims regarding Defendants' alleged failure to comply with the settlement Agreement are dismissed.

Where a *pro se* complaint fails to state a cause of action, a court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Id. (citation omitted). Here, better pleading could not cure Plaintiff's claims regarding enforcement of the settlement Agreement, and amendment of the Complaint on this issue would be futile. See Foman v. Davis, 371 U.S. 178, 182 (1962). Therefore, those claims are dismissed without leave to amend.[10]

### B. Jumah Services

Plaintiff alleges that Defendants Hulihan and Phillips at Mid-State and Defendant Connell at Oneida refused to allow separate Shiite Jumah services. Compl. at 10, 14, 19-20, 22. This issue directly involves the Rahman v. Goord settlement Agreement. Dkt. No. 27-2 ¶ 5. Therefore, as discussed *supra*, this claim is dismissed without leave to amend.

### C. Denial of Shiite Classes, Books, and Book Locker

Liberally construed, the Complaint alleges that Defendants Fischer, Perlman, Hulihan, Phillips, and Montiero violated Plaintiff's First Amendment rights, retaliated against him, and conspired against him by denying him Shiite study classes, books and a locker to store Shiite

---

[10] As stated, *supra*, resolution of this matter falls outside of the province of the federal courts and would appropriately be resolved as a contract dispute in state court. Given that state entities are a party to the Agreement, any such claim – to the extent properly brought otherwise – would have to be brought in the New York Court of Claims.

religious texts. Compl. at 10, 14, 18. The <u>Rahman v. Goord</u> settlement Agreement did not involve

Shiite study classes or book lockers. Thus, the Court has jurisdiction to consider these claims.

### 1. First Amendment

Plaintiff alleges that Defendants Fischer, Perlman, Hulihan, Phillips, and Montiero violated

his First Amendment rights by denying him Shiite classes and a storage locker. <u>Id.</u> at 10, 14, 18, 43,

45-49. Defendants have not addressed the First Amendment implications of Plaintiff's claim.

Prisoners retain some measure of the constitutional right to the free exercise of religion

guaranteed by the First Amendment. <u>Ford v. McGinnis</u>, 352 F.3d 582, 588 (2d Cir. 2003). While

there can be no question as to the fundamental importance of the Constitutional guarantee of

religious rights and freedoms, due to the unique concerns of the prison setting, courts have held that

prisoners' free exercise rights must be balanced against the interests of prison officials engaged in

the complex duties of administering the penal system. <u>Id.</u> Thus, a prison regulation or

individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged

under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental

rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is

reasonably related to legitimate penological interests." <u>Salahuddin v. Goord</u>, 467 F.3d 263, 274 (2d

Cir. 2006) (quoting <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349 (1987)) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed

conduct substantially burdens[11] his sincerely held religious beliefs." <u>Salahuddin</u>, 467 F.3d at 274-75

---

[11] Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. The <u>Ford</u> court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the <u>Ford</u> court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would

(citing Ford, 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. Ford, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Here, the repeated references to Shiite study classes and a storage locker in Plaintiff's voluminous complaint demonstrate that the classes and locker are *personally* important to Plaintiff. However, the Complaint does not allege facts plausibly suggesting that Plaintiff's Shiite beliefs were substantially burdened by the lack of classes or a locker. That is, Plaintiff has not explained how the lack of classes or a locker puts substantial pressure on him to modify his behavior and violate his beliefs. Therefore, Plaintiff's First Amendment claims regarding the classes and the locker are dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2).[12] However, mindful of

---

proceed as if the requirement applied. Likewise, the Salahuddin court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied.

Pugh v. Goord, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008)(citations and some punctuation omitted).

[12] Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." Salahuddin, 467 F.3d at 275 (quoting Ford,

Plaintiff's *pro se* status, the Court grants Plaintiff leave to amend because better pleading to clarify the alleged misfeasance's impact on Plaintiff's free exercise of his religion could potentially cure this defect.

### 2. Retaliation

Broadly construed, the Complaint alleges that Defendants Fischer, Perlman, Hulihan, and Montiero retaliated against Plaintiff for his success in <u>Rahman v. Goord</u> or his adherence to a minority religious belief by denying him Shiite classes and a locker. Compl. at 10, 14, 18, 43, 45-49. Defendants have not addressed the retaliation implications of this claim.

Claims of retaliation find their roots in the First Amendment. <u>See</u> <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the important principle that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. <u>See</u> <u>id.</u> at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. <u>See</u> <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted:

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act.

352 F.3d at 595) (punctuation omitted). Here, the burden does not shift to Defendants because Plaintiff's Complaint does not allege facts plausibly suggesting that a sincerely held religious belief has been substantially burdened by the lack of classes or a locker.

Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), overruled on other grounds by Swierkewicz v. Sorema N.A., 534 U.S. 506 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – that is, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Gill, 389 F.3d at 380 (citing Dawes v. Walker, 239 F.3d 489, 492 (2d. Cir. 2001)).

Here, the Complaint alleges facts plausibly suggesting that Plaintiff was engaged in protected conduct. "Prisoners . . . have a constitutional right of access to the courts and to petition the government for the redress of grievances." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Further, as discussed *supra*, prisoners retain a limited First Amendment right to practice their religion.

The Complaint does not, however, sufficiently allege adverse action. The Second Circuit defines "'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003), superceded by 320 F.3d 346 (2d Cir. 2003)) (emphasis in original). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Gill, 389 F.3d at 381. Here,

the Complaint does not allege facts plausibly suggesting that denial of Shiite classes or a locker would deter an individual similarly situated to Plaintiff from exercising his or her constitutional rights. As discussed above, the Complaint does not adequately explain the religious significance of the classes and the locker. The Court cannot find evidence on this record that the denial of the classes and the locker was sufficiently adverse to constitute a deterrent. Therefore, Plaintiff's retaliation claim regarding the classes and the locker is dismissed *sua sponte* with leave to amend to clarify this allegedly unconstitutionally deterrent effect.

### 3. Conspiracy

Plaintiff alleges that Defendants Fischer, Perlman, Hulihan and Montiero conspired to deny him Shiite classes and a locker. Compl. at 10, 14, 18, 43-49. Defendants argue that Plaintiff's conspiracy claims are barred by the intracorporate conspiracy doctrine. Dkt. No. 27-1 at 10-11.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. Bond v. Board of Educ. of City of New York, No. 97-CV-1337, 1999 WL 151702, at *2 (W.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." Lee v. City of Syracuse, 603 F. Supp. 2d 417, 442 (N.D.N.Y. 2009) (citations omitted). The Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978); Girard v. 94th and Fifth Ave. Corp., 530 F.2d 66, 72 (2d Cir. 1976)), but has not extended its application of the doctrine to conspiracy claims under § 1983.[13] Several district courts in the Second Circuit have applied the doctrine, without

---

[13] The Court notes that commentators have raised numerous objections to the application of the intracorporate conspiracy doctrine to civil rights statutes, based both on historical argument and also broader argument about the overarching statutory purposes of §§ 1983 and 1985. See, e.g., Catherine E. Smith, *(Un)Masking Race-Based Intracorporate Conspiracies Under the Ku Klux Klan Act*, 11 VA. J. SOC. POL'Y & L. 129 (2004); Barry Horwitz, Note, *A Fresh Look at a Stale Doctrine: How Public Policy and the Tenets of Piercing the Corporate Veil Dictate the Inapplicability of the*

discussion, to § 1983 cases.  See Samms v. Fischer, No. 9:10-CV-0349, 2011 WL 3876528, at *15 n.8 (N.D.N.Y. Mar. 25, 2011) (collecting cases).[14]  In Anemone v. Metropolitan Transportation Authority, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases.[15]

Even where the intracorporate conspiracy doctrine applies, however, there is an exception to the doctrine in situations where "individuals pursue personal interests wholly separate and apart from the entity."  Orafan v. Goord, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006) (citation and quotation marks omitted), vacated and remanded on other grounds, Orafan v. Rashid, No. 06-2951, 249 F. App'x 217 (2d Cir. 2007).[16]  Therefore, in applying the intracorporate conspiracy doctrine to

---

*Intracorporate Conspiracy Doctrine to the Civil Rights Arena*, 3 NW J. L. & Soc. Pol'y 131 (2008); Geoff Lundeen Carter, Comment, *Agreements Within Government Entities and Conspiracies Under § 1985(3) – A New Exception to the Intracorporate Conspiracy Doctrine?*, 63 U. Chi. L. Rev. 1139 (1996); Jennifer Martin Christofferson, Note, *Obstacles to Civil Rights: The Intracorporate Conspiracy Doctrine Applied to 42 U.S.C. § 1985(3)*, 1995 U. Ill. L. Rev. 411 (1995).

[14] The Clerk of the Court will provide Plaintiff with a copy of this unpublished Decision in accordance with the Second Circuit's decision in LeBron v. Sanders, 557 F.3d 76 (2d Cir. 2009).

[15] The Anemone Court stated that it would "apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound.  A civil rights conspiracy requires an agreement between two or more actors to inflict an unconstitutional injury.  This 'two or more actors' requirement cannot be satisfied where all of the alleged conspirators are employees of a single entity and acting within the scope of their employment as agents of that entity."  Anemone, 419 F. Supp. 2d at 604 (citations omitted).

[16] See, e.g., Bond v. Board of Education of the City of New York, No. 97 CV 1337, 1999 WL 151702, at *1 (E.D.N.Y. Mar. 17, 1999); Rini v. Zwirn, 886 F. Supp. 270, 293 (E.D.N.Y. 1995) (denying a motion to dismiss a § 1985 claim where a town employee, acting as an individual, conspired with other town employees); Agugliaro v. Brooks Bros., Inc., 802 F. Supp. 956, 963 (S.D.N.Y. 1992) (stating that the plaintiff may maintain a § 1985 claim against a corporation and its agents where the plaintiff alleges that defendants were acting upon their own motives); Yeadon v. New York City Transit Auth., 719 F. Supp. 204, 212 (S.D.N.Y. 1989) (rejecting defense that conspiracy within a corporation cannot exist in the context of a §1985 claim where a plaintiff adequately alleges a series of separate discriminatory acts by the corporate entity and its agents and

analogous cases, other courts in this Circuit have allowed claims to proceed when triable issues of fact were found to exist regarding whether officers acted pursuant to their personal interests. See, e.g., Medina v. Hunt, No. 9:05-CV-1460, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008) (holding that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleged that officers assaulted him in retaliation for participating in a federal lawsuit); Hill v. City of New York, No. 03 CV 1283, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (finding that the personal interest exception applies, and allowing conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force).

The Court is mindful of the remedial purposes of § 1983 and the need to read the statute broadly.[17] Therefore, to the extent that the intracorporate conspiracy doctrine applies to § 1983, a court should be particularly mindful of the exception discussed *supra*, so that the doctrine does not vitiate the very existence of claim § 1983 conspiracy claim. That being said, in the instant case, Plaintiff's conspiracy allegations are too speculative and too conclusory to support a claim or – to the extent that the intracorporate conspiracy doctrine applies – to trigger the doctrinal exception. The Court concludes that better pleading could not cure Plaintiff's claims, and amendment of the

---

where a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose).

[17] See, e.g., Monell, 436 U.S. at 684-85; Figueroa v. Molina, 725 F.Supp. 651, 655 (D. Puerto Rico 1989) (citing Rodriguez v. Comas, 888 F.2d 899, 905 (1st Cir. 1989) ("As the First Circuit has pointed out, section 1983 is a remedial statute and should be read broadly"); Richard Frankel, *The Failure of Analogy in Conceptualizing Private Enterprise Liability Under Section 1983*, 78 UMKC L. REV. 967, 992 n.141 (2010) (stating that "[m]any of the members of Congress debating § 1983 explicitly stated that the statute was intended to be read broadly in light of its remedial purpose" and citing statements of Congressmen to that effect); Barbara Kritchevsky, *Civil Rights Liability of Private Entities*, 26 CARDOZO L. REV. 35, 75 (2004) ("§ 1983 is a remedial statute and, as such, should be read broadly") (citing Hill v. Toll, 320 F. Supp. 185, 189 (E.D. Pa. 1970)).

Complaint on this issue would be futile.[18]  <u>Foman</u>, 371 U.S. at 182.  Therefore, Plaintiff's

conspiracy claim regarding the Shiite classes and locker is dismissed without leave to amend.

### D.  Programming

Plaintiff alleges that Defendant Phillips denied Plaintiff the programming that he requested

at Mid-State.  Compl. at 16.  Defendants have not addressed this allegation.  Dkt. No. 27-1.

Prisoners have no constitutional right to participate in prison programs, even those that might

expedite their release.  <u>Abed v. Armstrong</u>, 209 F.3d 63, 66-67 (2d Cir. 2000).  Therefore, this claim

is dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2).  Plaintiff is granted leave to amend

because there is a possibility that he could state a retaliation cause of action regarding this issue.

### E.  Urine Test

Plaintiff's Complaint is replete with references to the February 7, 2010 urine test, which

Plaintiff states was part of a conspiracy to deny him the right to practice is religion.  Compl. at 9, 12,

14, 35-37, 64.  As Defendants correctly note, Dkt. No. 27-1 at 8, the Exhibits attached to the

Complaint show that the results of Plaintiff's urine test were negative.  Dkt. No. 1 at 36.  Plaintiff

does not allege that he was subjected to any adverse consequences as a result of the urine test.

Therefore, Plaintiff's claims regarding the urine test are dismissed without leave to amend.

### F.  Disparaging Remarks

Plaintiff alleges that Defendant Montiero allowed his inmate facilitator to make disparaging

---

[18]  The Court notes further that to the extent Plaintiff attempts to state a claim of conspiracy
here, any such claim appears largely duplicative of many of the other claims raised in his Complaint,
which the Court grants Plaintiff leave to amend.  While the Court is careful to assess Plaintiff's
claims with the special solicitude afforded to *pro se* litigants, the Court concludes that it would be
both unnecessary and futile to allow Plaintiff to replead this claim specifically, when the substantive
allegations appear more clearly elsewhere and where Plaintiff appears to allege no discernible nexus
between alleged events, alleged conspirators, alleged animus, and alleged constitutional injuries.

remarks about Shiite Muslims. Compl. at 18. Defendants have not addressed this issue.

The Court concludes that the Complaint fails to state a claim with regard to this allegation. The Complaint does not allege that Defendant Montiero himself made any disparaging remarks. Even if it did, that allegation would not state a claim. "It is well established that mere threatening language and gestures of a custodial officer do not . . . amount to constitutional violations." <u>Alnutt v. Cleary</u>, 913 F. Supp. 160, 165 (W.D.N.Y. 1996) (punctuation omitted). "Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." <u>Jermosen v. Coughlin</u>, 878 F. Supp. 444, 449 (N.D.N.Y. 1995); <u>see also</u> <u>Aziz Zarif Shabazz v. Pico</u>, 994 F. Supp. 460, 474 (S.D.N.Y. 1998). Therefore, any claims regarding the disparaging remarks are dismissed *sua sponte* without leave to amend.

### G. Convincing Inmates Not to Register as Shiites

Under the <u>Rahman v. Goord</u> settlement agreement, DOCS agreed to provide Plaintiff with a Shiite Jumah service if a minimum of five Shiite Muslims at Plaintiff's facility were "available and desirous of availing themselves" of the service. Dkt. No. 27-2 ¶5(c). Broadly construed, the Complaint alleges that Defendant Montiero tried to convince other inmates not to register as Shiites so that Mid-State would not be required to conduct Jumah services. Compl. at 18. Because this allegation implicates the <u>Rahman v Goord</u> settlement Agreement, as discussed *supra*, the Court does not have jurisdiction over the claim. Therefore, for the reasons discussed *supra*, this claim is dismissed without leave to amend.

### H. Alternative Meals

The Complaint alleges that on one occasion, unnamed individuals in the Mid-State mess hall told Plaintiff that they would no longer provide the alternative religious meal if they ran out of it.

Plaintiff does not allege that he was personally deprived of an alternative religious meal. Even if he did, the allegation that Plaintiff was denied one meal would fail to state a claim under any constitutional theory. Gill v. Hoadley, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); Brewton v. Hollister, 948 F. Supp. 244, 249-50 (W.D.N.Y. 1996) (denial of a single meal does not constitute a due process violation); Snyder v. McGinnis, No. 03-CV-0902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (deprivation of meal on two occasions was *de minimis* and did not suffice to state a claim for retaliation).[19] Therefore, this claim is dismissed without leave to amend.

## I. Transfer from Mid-State to Oneida

Plaintiff alleges that Defendants prevented him from practicing his faith and retaliated against him for the Rahman v. Goord settlement by transferring him from Mid-State to Oneida after six inmates at Mid-State self-identified as Shiite Muslims.[20] Compl. at 13, 15. This claim appears to implicate the Rahman v. Goord settlement agreement. To the extent that the Court lacks jurisdiction over the claim, it is dismissed. To the extent that Plaintiff is attempting to state a retaliation claim, the Complaint fails to allege facts plausibly suggesting that Defendants took adverse action. In most cases, the transfer of a prisoner is not considered an "adverse action." See

_____

[19] The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in LeBron v. Sanders, 557 F.3d 76 (2d Cir. 2009).

[20] Defendants advance factual, rather than legal, arguments regarding Plaintiff's transfer claims. Dkt. No. 27-1 at 8, 14-15. Citing an Exhibit, they argue that Plaintiff's transfer "was occasioned by [P]laintiff's insistence that he be included in a sex offender program that was not available at Mid-State but was available at Oneida." Id. at 8. Although Defendants assert that the Exhibit (an October 25, 2010, letter from DOCS Deputy Commissioner and Counsel Maureen E. Boll) is attached to the Complaint, id. at 4, it does not appear in the version of the complaint that was electronically filed with the Court. The document is not subject to judicial notice. Therefore, the Court has not considered it in conjunction with this Motion to dismiss.

Coleman v. Sutton, 530 F. Supp. 2d 451, 453 (W.D.N.Y. 2008) (prisoner failed to state a retaliation claim where he did not allege that conditions into which he was transferred were more onerous than his original placement). Here, the Complaint does not allege facts plausibly suggesting that the placement at Oneida was any more onerous than the placement at Mid-State. Plaintiff is granted leave to amend the retaliation claim.

**J. Availability of Sink Before Prayer**

Plaintiff alleges that a non-defendant unit officer at Oneida Correctional Facility would not allow him to use the bathroom sink to make absolution before morning prayer. Compl. at 19. Plaintiff wrote a letter to Defendant Fischer complaining about this issue, to which Defendant Perlman responded. Id. at 19, 68.

The Complaint fails to state a claim because it does not allege the personal involvement of any named Defendant in the alleged Constitutional violation. "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct. Polk County v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003). That is, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Rather,

supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[21]

Regarding Defendant Fischer, a supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement.  Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997); see also Wright v. Genovese, 694 F. Supp. 2d 137, 161 (N.D.N.Y. 2010).  Therefore, the claim against Defendant Fischer regarding Plaintiff's access to the sink is dismissed without leave to amend.

Regarding Defendant Perlman, the second Colon category – that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal – applies only to situations where an alleged violation is ongoing, not to situations involving a one-time violation.  See, e.g., Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("It has been held that an appropriate guiding principle for determining personal responsibility is where a grievance alleges an ongoing constitutional violation, the supervisory official who reviews the grievance is personally involved if he is confronted with a situation that he can remedy directly.  If

---

[21]  In Iqbal, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies.  556 U.S. 662.  The Second Circuit has not yet issued a decision discussing Iqbal's effect on the Colon categories.  Several district courts in this Circuit have determined that Iqbal nullified some of the Colon categories.  See, e.g., Sash v. United States, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  The Court assumes – for purposes of this Motion – that Colon remains good law.

the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation.") (internal quotation marks and citations omitted); Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it."). Here, although Plaintiff states that "daylight savings time still did not allow me access to water," the Complaint does not allege facts plausibly suggesting that the problem was ongoing. Therefore, the claim against Defendant Perlman is dismissed with leave to amend.

## K. Can Lid Incident

Plaintiff alleges that Defendants Sharrow, Adamik, Connell, Prack, and Joslyn conspired to plant a can lid under his locker to deny Plaintiff the right to practice his religion and in retaliation for Plaintiff's lawsuit. Compl. at 19, 21-23. Defendants argue that Plaintiff's claims arising from this incident are barred by the rule in Heck v. Humphrey, 512 U.S. 477 (1994). Dkt. No. 27-1 at 15-16. The Court concludes that this claim is barred by Heck.

In Heck, the Supreme Court held that:

> in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

Heck, 512 U.S. at 486-87.  Under Heck and its progeny, "a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief) . . . – if success in that action would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005).  If a plaintiff whose success would necessarily demonstrate the invalidity of the confinement or its duration does not satisfy Heck's 'favorable termination' rule, he must seek relief through the federal habeas corpus statute rather than through § 1983.  Peralta v. Vasquez, 467 F.3d 98, 104 (2d Cir. 2006) ("[T]he purpose of the Heck favorable termination requirement is to prevent prisoners from using § 1983 to vitiate collaterally a judicial or administrative decision that affected the overall length of confinement and that punishments related to their term of imprisonment or the procedures that led to them . . . must be attacked through a habeas petition.")

In Edwards v. Balisok, 520 U.S. 641 (1997), the Supreme Court extended the Heck rule to prisoners' challenges to prison disciplinary proceedings that resulted in a loss of good time credits. The Court held that a prisoner seeking damages and declaratory relief regarding procedures used in a disciplinary hearing that resulted in a loss of good time credit is required to show that the disciplinary sentence has been reversed, declared invalid, or called into question by a federal court. The Second Circuit softened the Heck/Edwards rule somewhat by holding that "a prisoner can, without demonstrating that the challenged disciplinary proceedings or resulting punishments have been invalidated, proceed separately with a § 1983 action aimed at the sanctions or procedures that affected the conditions of his confinement . . . if he agrees to abandon forever any and all claims he has with respect to the sanctions that affected the length of his imprisonment."  Peralta v. Vasquez, 467 F.3d 98, 100 (2d Cir. 2006).

Here, Plaintiff lost four months of good time credits as a result of the disciplinary proceeding regarding the can lid. Compl. at 56. Plaintiff's claims regarding the incident are aimed at the sanctions and procedures that led to that loss of good time credits. Indeed, Plaintiff requests that this Court expunge the misbehavior report. Id. at 29-30. Plaintiff has not agreed to abandon forever any and all claims he has with respect to the sanctions that affected the length of his imprisonment. Accordingly, Plaintiff's claims regarding the can lid incident are barred by the rule in Heck. Therefore, these claims are dismissed. Leave to amend is granted if Plaintiff agrees to abandon any and all claims he has with respect to the loss of good time credits.

### L. Defendant Connell

The Complaint makes a series of allegations about Defendant Connell. Plaintiff alleges that he tried on several occasions to speak to Defendant Connell, but that she was unresponsive. Compl. at 19, 20. Plaintiff alleges that he wrote to her and told her how he was assaulted by her staff for wanting to practice his faith. Id. at 19. Plaintiff alleges that Defendant Connell "ignored all my complaints." Id. at 20. Defendants argue that Plaintiff has not adequately alleged Defendant Connell's personal involvement in any constitutional violation. Dkt. No. 27-1 at 17. The Court concludes that Defendants are correct.

A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference . . . by failing to act on information indicating that the violation was occurring." Rivera v. Goord, 119 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2000); see also Watson v. McGinnis, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.").

Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002). Therefore, the claims against Defendant Connell are dismissed without leave to amend.

## M. Eighth Amendment

Plaintiff further alleges that Defendants violated his Eighth Amendment rights. Compl. at 30. Defendants have not addressed this claim.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. Estelle v. Gamble, 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Id. at 102. Thus, the Eighth Amendment imposes on prison officials the duty to "provide humane conditions of confinement" for prisoners. Farmer v. Brennan, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Id. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

Plaintiffs pursuing Eighth Amendment claims must allege facts plausibly suggesting both an objective and a subjective component. Farmer, 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission . . . result[ed] in the denial of the minimal civilized measure of life's necessities." Id. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-

confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992). Here, Plaintiff has not alleged any such extreme deprivations. Better pleading could not cure this defect. Therefore, Plaintiff's Eighth Amendment claims are dismissed *sua sponte* without leave to amend.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to dismiss for failure to state a claim (Dkt. No. 27) is **GRANTED consistent with the terms of this Memorandum-Decision and Order**. Plaintiff is **granted leave to amend** the following claims: (1) the First Amendment and retaliation claims regarding Shiite classes, books and a storage locker; (2) the claim that he was denied non-religious programming; (3) the retaliation claim regarding the transfer from Mid-State to Oneida; (4) the claim against Defendant Perlman regarding use of the sink before morning prayer; and (5) the claims arising from the can lid incident. All other claims are **DISMISSED without leave to amend**; and it is further

**ORDERED**, that if Plaintiff does not amend his Complaint within **thirty (30) days** of this Memorandum-Decision and Order, judgment will be entered in Defendants' favor without further order of the Court; and it is further

**ORDERED**, that the Clerk provide Plaintiff with copies of Samms v. Fischer, No. 9:10-CV-0349, 2011 WL 3876528 (N.D.N.Y. Mar. 25, 2011) and Snyder v. McGinnis, No. 03-CV-0902, 2004 WL 1949472 (W.D.N.Y. Sept. 2, 2004) in accordance with the Second Circuit's decision in LeBron v. Sanders, 557 F.3d 76 (2d Cir. 2009); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on the Parties.

35

**IT IS SO ORDERED**.


DATED:      September 28, 2012
               Albany, New York


_____
Lawrence E. Kahn
U.S. District Judge