UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHA-HEED RAHMAN,

                              Plaintiff,

                                                        9:10-CV-1496
v.                                                      (LEK/TWD)

BRIAN FISCHER, KENNETH S. PERLMAN,
HULIHAN, K. PHILLIPS, IMAM MONTIERO,
S.A. CONNELL, JOSLYN, ADAMIK, SHARROW,
ALBERT PRACK,

                              Defendants.
_____

APPEARANCES:                                            OF COUNSEL:

SHA-HEED RAHMAN, 90-A-0409
Plaintiff pro se
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403


HON. ERIC T. SCHNEIDERMAN                                ROGER W. KINSEY, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

        This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  In

his original complaint, Plaintiff Sha-Heed Rahman alleged that Defendants violated a settlement

agreement, retaliated against him, and conspired to punish him for exercising his First

Amendment rights to exercise his religion and access the courts. (Dkt. Nos. 1, 56.) The matter is

currently before the Court for screening of Plaintiff's amended complaint. (Dkt. No. 56.) For the

reasons discussed below, I recommend that the Court dismiss all of Plaintiff's claims without

leave to amend except for Plaintiff's First Amendment free exercise claim regarding use of the

sink before morning prayer at Oneida Correctional Facility. I recommend that Defendants

Connell and Joslyn be directed to respond to that claim.

## I.    FACTUAL AND PROCEDURAL SUMMARY

### A.    Allegations and Procedural History of the Original Complaint

Unless otherwise specified, the facts in this section appear on the face of the original

complaint.

Until approximately ten years ago, the New York Department of Correctional Services

("DOCS")[1] did not officially recognize the doctrinal differences between Shiite[2] and Sunni

Muslims. In 1998, a Shiite inmate filed a grievance asking for separate study meetings, classes,

or study groups for Shiite inmates. (Dkt. No. 1 at 122.) DOCS' Central Office Review

Committee ("CORC") denied the grievance, stating that "CORC has been advised by the

Department's Imam that all Muslim religious groups fall under Islam, with the exception of the

. . . Nation of Islam. All practice the same faith and should not be separated, as the grievant

---

[1]    On April 1, 2011, DOCS merged with the Division of Parole to form the Department of Corrections and Community Supervision. The events giving rise to this action occurred before the merger and the Court will therefore refer to the agency by its former name.

[2]    The term "Shiite" is spelled in different ways in the record. The Court, in the style of the Associated Press, will use "Shiite" unless quoting material that uses an alternate spelling.

suggests." *Id.*

The inmate challenged CORC's determination in the state courts of New York. *Id.* The Supreme Court for the County of Dutchess concluded that CORC's decision was arbitrary and capricious because of the significant differences between Sunni and Shiite beliefs and religious practices. *Id.* at 124-25. The court ordered the Commissioner of DOCS to permit Shiite inmates to have contact with a volunteer Shiite scholar and, if no such volunteer was available, to allow Shiite inmates to participate in a religious education class or study group. *Id.* at 125.

The Commissioner appealed. The appellate court affirmed the Supreme Court's decision but modified the judgment. *Cancel v. Goord*, 717 N.Y.S.2d 610 (2d Dep't 2000). The appellate court agreed that in "light of the overwhelming evidence in the record that significant dogmatic differences separate the two Muslim communities . . . the denial of the grievance was arbitrary and capricious." *Id.* at 612. However, the appellate court stated that "religious freedom within a prison cannot be unfettered" and "must be balanced against security considerations and the State's legitimate correctional goals." *Id.* (citations omitted). Accordingly, the appellate court modified the judgment to delete the portions of the order that "directed the manner in which [DOCS] was to permit the petitioner and his fellow adherents of the Shi'a sect of Islam to practice their faith." *Id.* The appellate court remanded the matter to DOCS "to conduct administrative proceedings, with Shi'a participation, to determine the manner in which best to afford Shi'a inmates separate religious services, under appropriate Shi'a leadership, in a time and place that comports with legitimate penological concerns." *Id.* The New York Court of Appeals denied leave to appeal. *Cancel v. Goord*, 96 N.Y.2d 707 (2001).

On August 6, 2001, DOCS issued a protocol regarding religious practices and

programming for Shiite Muslim inmates (the "Shiite Protocol"). (Dkt. No. 1 at 129, 131-33.) As is pertinent here, the Shiite Protocol stated that

> Shi'ite Muslim inmates shall have the same rights as all other inmate faith groups to attend Shi'ite Muslim religious education and study classes. These Shi'ite Muslim education and study classes may utilize Shi'ite Muslim inmate facilitators in the same manner and to the same extent as other religious education class programs . . . .
>
> Shi'ite Muslim inmates shall be afforded the full and equal opportunity to participate in, without discrimination, the weekly Friday Juma service for all Muslim inmates of a particular correctional facility. Shi-ite Muslim Chaplains, whether they be employees or outside volunteers, shall be entitled to officiate at the weekly Juma services in the same manner as any other Muslim chaplain or outside volunteer Chaplains. In any facility in which Shi'ite Muslim inmates are present in the general population, the Muslim Chaplain of that facility shall ensure that the Muslim Majlis shall have at least one Shi'ite Muslim member . . . .
>
> The Department shall revise its Religious Observance Calendar . . . to include observances unique to Shi'ite Muslims, namely the observances of Ashura and the Id-ul-Ghadeer Khum.

*Id.* at 132-33.

In 2004, Plaintiff brought a civil rights lawsuit against DOCS officials in the Western District of New York. *Rahman v. Goord*, No. 04-CV-6368 CJS, 2007 U.S. Dist. LEXIS 32680, 2007 WL 1299408 (W.D.N.Y. May 3, 2007). Plaintiff alleged that DOCS was violating the Shiite Protocol by employing only Sunni chaplains at DOCS facilities and by not allowing inmates to observe Shiite holy days. *Rahman*, 2007 WL 1299408, at *2. Plaintiff also alleged that the Shiite Protocol itself was invalid because it failed to provide for separate Shiite Jumah services, which Plaintiff contended violated the ruling in *Cancel v. Goord*. *Id.*

The parties engaged in settlement negotiations. On or about December 26, 2009,

4

Defendant Brian Fischer, Commissioner of DOCS, offered to send Plaintiff to Mid-State Correctional Facility, where Plaintiff would be able to participate in non-religious programming and attend a Shiite Jumah service. (Dkt. No. 1 at 9, 10.) Plaintiff told his attorney that he would agree to sign the settlement agreement if he was allowed to participate in specific non-religious programming. *Id.* at 10. Plaintiff alleges that "had DOCS stated they would transfer me from Mid-State within thirty (30) days I would not have agreed to sign the stipulation and requested to go to trial." *Id.* at 10-11. On January 14, 2010, Plaintiff was transferred to Mid-State. *Id.* at 32.

The *Rahman v. Goord* litigation was terminated by stipulation of settlement on January 28, 2010. (Dkt. No. 27-2 at 52-59.) Under the agreement, DOCS agreed to provide Plaintiff an alternate Shiite Jumah service under certain conditions. *Id.* ¶ 5 (a-j). Specifically, in order for the service to be held, "a minimum of five (5) self-identified Shiite Muslims . . . must be available and desirous of availing themselves of the alternative Shiite Jumah service." *Id.* ¶ 5(c). The agreement did not discuss Shiite study classes or groups. The agreement stated that it embodied:

> the entire agreement of the parties in this matter and no oral argument (sic) entered into at any time nor any written agreement entered into prior to the execution of this private settlement and its approval by the Court regarding the subject matter of the instant proceedings, shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein.

*Id.* ¶ 9. Under the agreement, Plaintiff agreed not to commence any court, arbitration or administrative action pertaining to the same facts as the *Rahman v. Goord* litigation. *Id.* ¶ 1. However, Plaintiff retained the right to enforce the settlement agreement. *Id.*

When Plaintiff arrived at Mid-State, a lieutenant told him that Defendant Superintendent

Hulihan and Defendant Deputy Superintendent of Programs K. Phillips did not want to have two Muslim services. (Dkt. No. 1 at 10, 14.) Plaintiff's request for Shiite study classes was also denied. Defendant Fischer, through Defendant Deputy Commissioner Kenneth S. Perlman, informed Plaintiff that the *Rahman v. Goord* settlement stated that "to have Shiite Islamic study classes there must be 5 registered Shiite Muslims." *Id.* at 10. Plaintiff alleges that "certainly Mr. Fis[c]her knew that *Rahman v. Goord* . . . does not speak about Islamic classes so he added that position to the stipulation which I did not agree to." *Id.* Plaintiff filed a grievance, which Defendant Phillips denied. *Id.*

When Plaintiff arrived at Mid-State, his counselor told him that he would have to wait until 2011 to begin the non-religious programming that he had requested. *Id.* at 12. In the original complaint, Plaintiff alleged that Defendant Phillips told the counselor "not to enroll me in my programs because I'll be gone." *Id.* at 16. Plaintiff also alleged that Defendant Hulihan knew that Plaintiff should have been enrolled in the non-religious programming. *Id.* at 14-15.

After Plaintiff arrived at Mid-State, he sent a letter to Defendant Hulihan expressing his desire to establish a Shiite Islamic class and requesting funds to purchase books. *Id.* at 14. Defendants Hulihan and Phillips denied the request because "they both felt that [the settlement agreement in] *Rahman v. Goord* . . . states you must have (5) people to have Shiite Islamic classes." *Id.* Plaintiff argued that the settlement agreement "speaks only of Jumah service," but Defendants Hulihan and Phillips denied the grievance "even though they knew they were wrong." *Id.*

On February 7, 2010, Defendant Fischer conspired with Defendants Phillips and Hulihan to give Plaintiff "a dirty urine test result to prevent Shiite Jumah services" and classes. *Id.* at 9,

12.  In the original complaint, Plaintiff alleged that "the officer taking my urine stated that I will have a positive return test and [be] sent to the box."[3]  *Id.* at 14.

On the day of the urine test, Plaintiff filed a grievance complaining that his urine sample had been mislabeled.  *Id.* at 35, 37.  In the original complaint, he alleged that the mislabeling may have been in retaliation for the *Rahman v. Goord* settlement.  *Id.*  The Inmate Grievance Resolution Committee ("IGRC") denied Plaintiff's grievance.  *Id.* at 36.  The IGRC stated that

> the officer collecting the urine samples has gone on record and admitted to inadvertently mixing up the collection container, corrected the error and both samples tested negative.  The status of grievant's lawsuit was unknown to security personnel at submission of names for random urinalysis testing.

*Id.*

In the original complaint, Plaintiff alleged that Defendant Imam Montiero, the imam at Mid-State, conspired with the other Defendants to deny Plaintiff his religious rights in a variety of ways.  *Id.* at 18.  First, Defendant Montiero refused to establish a Shiite study class or a book locker for Shiite texts because there were not five registered Shiite Muslims at Mid-State.  *Id.*  Plaintiff informed Defendant Montiero that neither the 2001 Shiite protocol nor the settlement agreement in *Rahman v. Goord* required that there be five Shiites for classes or lockers.  *Id.*  Rather, Plaintiff informed Defendant Montiero, the five-Shiite requirement applied only to Jumah services.  *Id.*  Second, Defendant Montiero tried to convince inmates not to register as Shiites.  *Id.*  Specifically, Defendant Montiero, at the behest of Defendant Phillips, interviewed one inmate who wanted to self-identify as Shiite, but Defendant Montiero "decided to convince

---

[3]    Inmates who are sent to the Special Housing Unit ("SHU" or "the box") for disciplinary reasons lose many privileges, including some varieties of religious observance.

[the inmate] that being Muslim is not for him . . . because [he] is white." *Id.* Third, Defendant

Montiero allowed his inmate facilitator to make disparaging remarks about Shiite Muslims on the

day of Jumah. *Id.*

On February 9, 2010, Plaintiff wrote to the Inmate Grievance Program ("IGP")

complaining that he had been told that the mess hall would no longer provide the alternative meal

once they ran out of it. *Id.* at 40. Plaintiff asked that the facility create a system that would

ensure that inmates who do not eat meat or fish for religious reasons would be able to receive the

alternative meal. *Id.*

On February 10, 2010, Plaintiff wrote to Defendant Fischer complaining about the

unavailability of the alternative meal. *Id.* at 41-42. Deputy Commissioner Gayle Haponik

responded on behalf of Defendant Fischer. *Id.* at 50. Ms. Haponik stated that:

> [t]he regional coordinator spoke with the food service administrator
> and he has reported that they are providing an alternative when it is
> on the menu. If they run out of the alternative, an appropriate
> substitution will be made. In the future, if the main entree is tuna
> fish, and they run out of cheese as the alternative, an appropriate
> substitution will be made for the cheese.

*Id.*

On February 10, 2010, Plaintiff wrote to the IGP complaining that Defendants Hulihan

and Phillips were misapplying the 2001 Shiite protocol. *Id.* at 43-44. Plaintiff explained that

Shiite classes and books needed to be provided even if there were not five Shiite Muslims in the

facility. *Id.* at 43. He stated that other facilities provided classes and books despite having fewer

than five registered Shiite Muslims. *Id.* Plaintiff requested a classroom with a secure book

locker. *Id.* at 44.

On February 19, 2010, Plaintiff wrote to the IGP again requesting Shiite classes and books. *Id.* at 45, 47-49. The IGP denied Plaintiff's grievance. *Id.* at 46. The IGP stated that "[e]ducational classes for the Shi'ite Muslim faith will be determined by the number of practicing Shi'ite Muslims currently housed at the facility . . . . This facility has established five (5) as the number of registered Shi'ite Muslims prior to implementing educational classes." *Id.* at 46.

In the original complaint, Plaintiff alleged that Defendants Perlman and Fischer prevented Plaintiff from practicing his faith "by ordering that [Plaintiff] be transferred from Mid-State Correctional Facility to Oneida Correctional Facility . . . after [Plaintiff had] gotten six inmates at Mid-State Correctional Facility to self-identify as Shia Muslims." *Id.* at 13, 15. Plaintiff alleged that "they had no reason to transfer me to Oneida Correctional Facility." *Id.* at 15. On February 22, 2010, Plaintiff was transferred to Oneida. (Dkt. No. 1 at 82.)

On or about March 2, 2010, a lieutenant at Oneida stopped Plaintiff and told him not to unpack his property. (Dkt. No. 1 at 19.) Plaintiff immediately spoke with Oneida's Sunni Islamic Chaplain, who assured Plaintiff that he would express Plaintiff's concerns to Defendant S.A. Connell (Oneida's Superintendent) and Defendant Deputy Superintendent of Programs Joslyn. *Id.*

At Oneida, Plaintiff was told by an unnamed unit officer that he could not use the bathroom sink to make absolution for prayer. (Dkt. No. 1 at 19.) Plaintiff wrote a complaint to Defendant Fischer because morning prayer was at about 5:00 a.m. and the officer stated that Plaintiff must wait until 6:30 a.m. to wash, which would make Plaintiff miss prayer. *Id.* In response, Defendant Perlman stated that "I have been informed that this matter has been resolved

due to the recent time change to Daylight Savings Time, which allows you access to water for your religious obligations and coincides with facility operations at Oneida Correctional Facility." *Id.* at 68. In the original complaint, Plaintiff stated that "daylight savings time still did not allow me access to water." *Id.* at 19.

On March 29, 2010, Defendant Correction Officer Sharrow issued a misbehavior report charging Plaintiff with (1) possessing an item that may be classified as a weapon or dangerous instrument; and (2) possessing an altered item. (Dkt. No. 1 at 55-56.) The misbehavior report stated

> On the above date & time I CO Sharrow was conducting a cube search on inmate Rahman 90A0409. I tipped his large locker over and found a metal can lid bent over underneath it. Area supervisor was then notified. Contraband was then placed in the contraband locker shelf #2. Cube search authorized by Sgt. Reynolds.

*Id.* at 55.

Defendant Sharrow was not assigned to Plaintiff's housing unit, but had been told by Defendant Captain Adamik and a non-defendant sergeant to say he found the can lid in Plaintiff's cell so that Plaintiff would be sent to the SHU and out of Oneida. (Dkt. No. 1 at 23.) Defendant Sharrow issued the misbehavior report and a contraband receipt "so that th[ere] will not be a Shiite Jumah prayer service with [Plaintiff] in the box." *Id.* In the original complaint, Plaintiff alleged that Defendant Sharrow's bad faith was demonstrated by the fact that the locker had been searched three other times by two different officers who never found a can lid. *Id.*

Defendant Adamik served as the hearing officer at the disciplinary hearing on the misbehavior report. (Dkt. No. 1 at 56.) Plaintiff asserted in his original complaint, as he did at the time of the hearing, that Defendant Adamik violated DOCS regulations by waiting too long

after the misbehavior report to commence the hearing.  *Id.* at 22.  Plaintiff alleged that when he

raised the issue at the hearing, Defendant Adamik said he could do as he pleased.  *Id.*  Defendant

Adamik noted that Plaintiff liked litigating and said the delay would give Plaintiff another issue

to argue.  *Id.*  Plaintiff alleged that Defendant Adamik told Plaintiff off the record that Defendant

Connell did not want another group of Muslims having services in her facility and the only way

to ensure that Plaintiff leave the facility was to have Defendant Sharrow say he found a can lid

under Plaintiff's locker.  *Id.*

At the hearing, Defendant Adamik considered Defendant Sharrow's written report,

Plaintiff's testimony that the can lid was not his and that he had a medical history indicating that

he would not be able to lift the locker easily, an unusual incident report, photographs of the can

lid and the can lid itself, testimony by four inmate witnesses on Plaintiff's behalf, and the

testimony of Defendant Sharrow.  (Dkt. No. 1 at 57-58.)

Defendant Adamik found Plaintiff guilty and sentenced Plaintiff to five months in the

SHU, six months' loss of recreation, commissary, and phone privileges, seven months' loss of

package privileges, and four months' loss of good time credits.  (Dkt. No. 1 at 56.)  Defendant

Adamik stated that his reason for the guilty disposition was that:

> possession of contraband is a serious matter.  The can lid was
> fashioned so as to be easily used as a weapon.  All [inmates] are
> responsible for contents of their cube areas.  The misbehavior report
> clearly indicates that the can lid was found in [Plaintiff's] assigned
> cube.  The disposition is intended to impress upon [Plaintiff] that this
> behavior will not be tolerated in a correctional facility.

*Id.* at 57.

Plaintiff appealed Defendant Adamik's decision.  (Dkt. No. 1 at 60-63.)  Plaintiff argued

that Defendant Adamik was biased and that the hearing was untimely.  *Id.*  Plaintiff argued that

Defendant Sharrow framed him in order to deny Plaintiff the opportunity to practice his faith. *Id.* at 62-63.

Plaintiff filed a supplemental appeal on April 15, 2010. (Dkt. No. 1 at 64-66.) There, Plaintiff complained that his settlement agreement stated that he would be sent to Mid-State, enrolled in non-religious programming, and provided an alternative Shiite Jumah service but that when he got six other inmates to self-identify as Shiite Muslims "agents of DOCS tried to give me a dirty urine and have me sent to the box." *Id.* at 64. Plaintiff stated that when another inmate self-identified as a Shiite, the can lid was placed under Plaintiff's locker. *Id.* Plaintiff stated that Defendant Sharrow was not even assigned to Plaintiff's dorm when he found the can lid. *Id.* at 66. Plaintiff alleged that Defendant Adamik never gave him a copy of the unusual incident report. *Id.* at 65. Plaintiff alleged that Defendant Adamik said that the facility would not have two Muslim groups. *Id.* at 66.

Plaintiff filed another supplemental appeal on April 24, 2010. (Dkt. No. 1 at 67.) Plaintiff stated that he had been given an opportunity to listen to the hearing tape and that Defendant Adamik had erased a part of an inmate's testimony. *Id.* That inmate testified that several inmates had dropped can lids in the area. *Id.* Plaintiff stated that Defendant Adamik was biased because he directed Defendant Sharrow not to respond when Plaintiff asked "as a professional do you think it logical for a person with no history of drugs or weapons on his record in 23 years to leave a can lid under his own locker when he knows they search his cube every 12 to 16 days." *Id.*

Defendant Albert Prack affirmed Defendant Adamik's decision on May 19, 2010. (Dkt. No. 1 at 59.) In the original complaint, Plaintiff alleged that Defendant Prack conspired to keep

Plaintiff in the SHU by failing to review the tape of Plaintiff's hearing before affirming the decision. *Id.* at 24. Plaintiff alleged that Defendant Prack did so to prevent Plaintiff from practicing his religion. *Id.*

Plaintiff filed a state court action. (Dkt. No. 1 at 7; *Rahman v. Fischer*, No. 4005-10 (Albany County Supreme Court)). In that action, Plaintiff challenged the results of the disciplinary hearing that Defendant Adamik conducted. (Dkt. No. 27-2 at 86.) Plaintiff argued that the hearing was not timely commenced. *Id.* at 95. Plaintiff also argued that Defendant Adamik erased a portion of the hearing tape in which a witness testified that "he knew other inmates dropped can lids and some went under [Plaintiff's] locker." *Id.* at 98. Plaintiff requested that the misbehavior report be expunged from his record. *Id.* Plaintiff's petition did not mention Plaintiff's religious complaints, but attachments to the petition included grievances mentioning the issue. *Id.* at 114. In response, Defendant Fischer argued that Defendant Adamik was impartial, that the hearing was timely commenced and concluded, and that the hearing was completely recorded. *Id.* at 135-143. The response did not mention Plaintiff's religion or any issues associated with it, although attachments to the response included grievances mentioning the issue. *Id.* at 187.

The court entered judgment in favor of the defendants. (Dkt. No. 1 at 8.) The court held that the record failed to show that Defendant Adamik violated DOCS regulations regarding the timing of the disciplinary hearing. (Dkt. No. 27-2 at 62.) The court noted in addition that "the time limits imposed by the regulations are directory, not mandatory," and thus Plaintiff would have had to demonstrate substantial prejudice even if the regulations were violated. *Id.* The court stated that Plaintiff had failed to demonstrate any prejudice from the alleged delay. *Id.* at

63.  The court rejected Plaintiff's arguments regarding inmate testimony and the alleged erasing

of the hearing tape.  *Id.*  The court found that Plaintiff had failed to establish that the disciplinary

determination was arbitrary, capricious, or illegal or that he was denied a fair and impartial

determination and/or due process.  *Id.*

Plaintiff filed this action in the Western District of New York on October 13, 2010.  (Dkt.

No. 1.)  It was transferred to this District because Mid-State and Oneida are located in the

Northern District of New York.  (Dkt. No. 4.)  In the original complaint, Plaintiff sought an

injunction "preventing DOCS and its agents from violating the court order in *Rahman v. Goord*,"

a transfer to Mid-State so that he can participate in specified programming, expungement of the

misbehavior report from his record, and five million dollars in damages. (Dkt. No. 1 at 29-30.)

In July 2011, Plaintiff moved in the Western District of New York to reopen *Rahman v.

Goord* on the grounds that DOCS had breached the settlement agreement.  *Rahman v. Goord*,

No. 04-CV-6368 CJS,  Dkt. No. 99 (W.D.N.Y. Aug. 4, 2011).  Specifically, Plaintiff alleged that

DOCS was not providing him with a separate Shiite Jumah service and had improperly

transferred him out of Mid-State.  *Id.* at 4.  The court denied the motion on both subject matter

jurisdiction grounds and under Federal Rule of Civil Procedure 60(b)(6).  *Rahman v. Goord*, No.

04-CV-6368 CJS,  Dkt. No. 100 at 3-6.

### B.      Defendants' Motion to Dismiss

Defendants moved to dismiss the original complaint in this action.  (Dkt. No. 27.)

Defendants argued that (1) this Court lacked jurisdiction to enforce the settlement agreement; (2)

Plaintiff's conspiracy claims were barred by the intracorporate conspiracy doctrine; (3) the

complaint failed to state a cause of action regarding the urine test because the exhibits to the

complaint showed that the result of the test was negative; (4) Plaintiff's claims regarding the

misbehavior report were barred by the doctrine of collateral estoppel and the rule in *Heck v.

Humphrey*, 512 U.S. 477 (1994); (5) the complaint failed to state a retaliation claim regarding the

transfer from Mid-State to Oneida; (6) the complaint failed to allege personal involvement by

Defendants Fischer, Perlman, Prack, Hulihan, Montiero, Phillips, Connel, or Joslyn; (7)

Plaintiff's pendent state law claims should be dismissed under New York Correction Law § 24;

(8) the Eleventh Amendment bars suit against the State of New York; and (9) Defendants were

entitled to qualified immunity.  (Dkt. No. 27-1.)  Defendants did not address the First

Amendment implications of Plaintiff's claim regarding the denial of Shiite classes, books, and a

book locker.  (Dkt. No. 50 at 19.)  Defendants did not address Plaintiff's claim that they

retaliated against him by denying him Shiite classes, books, and a book locker.  *Id.* at 21.

Defendants did not address Plaintiff's claim that Defendant Phillips denied him programming at

Mid-State.  *Id.* at 26.  Defendants did not address Plaintiff's allegation that Defendant Montiero

allowed his inmate facilitator to make disparaging remarks about Shiite Muslims.  *Id.* at 26-27.

Defendants did not address Plaintiff's claim that they violated his Eighth Amendment rights.  *Id.*

at 34.

> ### C.     Ruling on Defendants' Motion to Dismiss

On September 28, 2012, this Court granted Defendants' motion.  (Dkt. No. 50.)  The

Court found that it did not have jurisdiction to enforce the *Rahman v. Goord* settlement

agreement and accordingly dismissed all claims that implicated that agreement without leave to

amend.  *Id.* at 15-18.  The Court dismissed Plaintiff's First Amendment, retaliation, and

conspiracy claims regarding the denial of Shiite classes, books, and a book locker.  *Id.* at 18-26.

The Court granted Plaintiff leave to amend the First Amendment claim (*Id.* at 20-21) and the

retaliation claim (*Id.* at 23). The Court dismissed Plaintiff's claim regarding his programming

with leave to amend to reframe it as a retaliation claim. (Dkt. No. 50 at 26.) The Court

dismissed Plaintiff's claims regarding the urine test without leave to amend. (Dkt. No. 50 at 26.)

The Court dismissed Plaintiff's claim that Defendant Montiero allowed his inmate facilitator to

make disparaging remarks about Shiite Muslims without leave to amend. (Dkt. No. 50 at 26-27.)

The Court dismissed Plaintiff's claim regarding alternative religious meals without leave to

amend. (Dkt. No. 50 at 27-28.) The Court dismissed Plaintiff's retaliatory transfer claim with

leave to amend. (Dkt. No. 50 at 28-29.) The Court dismissed Plaintiff's claim against Defendant

Perlman regarding use of the bathroom sink with leave to amend. (Dkt. No. 50 at 30-31.) The

Court dismissed Plaintiff's claims regarding the can lid incident with leave to amend. (Dkt. No.

50 at 31-33.) The Court dismissed Plaintiff's claims against Defendant Connell without leave to

amend. (Dkt. No. 50 at 33-34.) The Court dismissed Plaintiff's Eighth Amendment claims

without leave to amend. (Dkt. No. 50 at 34-35.)

### D.    Allegations of the Amended Complaint

Plaintiff filed an amended complaint on November 15, 2012. (Dkt. No. 56.) The

amended complaint names Brian Fischer, Kenneth Perlman, Superintendent Hulihan, K. Phillips,

Superintendent Connell, Joslyn, Adamik, Sharrow, and Prack as Defendants. (Dkt. No. 56 at 1-

4.)

The amended complaint lacks the detail of the original complaint. Indeed, it does not

appear to be a complete document. The section of the amended complaint labeled "facts" begins

half-way through a sentence. (Dkt. No. 56 at 7.) That fragment states: "tells me that I should not

unpack my property because I will not be at Oneida for long." *Id.* It continues:

> I complain to the Sunni Islamic Chaplain and he informs me that he
> will take my concerns to Dep. Joslyn to deal with. I write a letter to
> Commissioner Brian Fischer and inform him that the staff at this
> facility Superintendent Connell and Dep. Joslyn has established an
> policy that prevents Muslims from making their morning prayer. This
> policy is that you cannot use the bathroom sink before Six am (6:00
> a.m.) and if you do you['re] going to be given an Mis[be]havior
> Report. That policy effectively denied me the right to practice my
> faith. As a result of that my cube was searched several times. I
> asked the officer why is my cube being searched so many times in the
> course of an few days. He stated that I must have pissed someone off.
> Mr. Morrison self-Identified as an Shi'ite Muslim and the next day
> my Cube was being searched while I was at programs by an officer
> that didn't even work at the Sex Offender Dorm. Each previous time
> my cube was searched I was allowed to be present at the time of the
> search. The Officer even waited one time until I came back from the
> gym. But what Officer Sharrow failed to consider is that each
> morning a counselor and two inmates walk around the whole dorm
> and inspect each cube before we leave for programs each day. A
> Ham Can Lid was said to be found in front of an locker that sits
> almost six inches off the floor. Officer [S]harrow could not explain
> why would an Muslim have an Ham Can Lid or that he had any
> information indicating that I was selling or making weapons of
> any[]kind. Captain Adamik showed his unfairness when he refused
> to allow [O]fficer Sharrow to respond to questions and when he
> erased a portion of the testimony of an witness. Captain Adamik
> knew that I had an right to be present during the cube search and that
> plaintiff did not have control[] over the area in question. Yet Captain
> Adamik showe[d] his vindictiveness by imposing Four Months Lost
> of Goodtime, which makes no sense because plaintiff has no
> goodtime to lose. Although I have complaine[d] to Superintendent
> Connell she did nothing but allow her staff to violate my rights. I was
> given Five months in the Special Housing Unit and lost four months
> of goodtime. Simply because they did not want[]to have an Shi'ite
> Islamic service at their facility. Superintendent Connell refused to
> investigate this mater and created an custom that allowed [O]fficer
> [S]harrow to feel comfortable enough to violat[e] . . . rules and
> regulations . . . . Plaintiff should have been allowed to be present for
> his cell search. Captain Adamik also knew that my cube was
> searched three (3) times before this time with [O]fficer Sharrow.
> Captain Adamik stated that every cube gets searched every thirty days

(30) that was not the case with plaintiff.

*Id.* at 7-8.

That language is followed by eight "causes of action," one for each named Defendant. *Id.* at 10-13. Regarding Defendant Fischer, the amended complaint alleges that:

> Defendant Fischer entered into an agreement knowing that . . . his subordinates would not honor it. He had no reason to transfer me to Oneida C.F. because in January 2010, Mid-State Correctional Facility had a [s]ex [o]ffender [p]rogram. My [a]ttorney [i]nformed Fischer's [o]ffice that I am only signing this agreement because once at Mid-State I'll be able to take the sex offender program and practice my faith. To show Mr. Fischer['s] contempt and insubordination of the law rules and regulations, on Nov. 4, 2012, eid Ghadir celebration came and, I was denied the right to observe this event, Commissioner[] Fischer's office has informed Acting Dept Supt. Cully, in charge of Program Services and Decon Maloney, Senior chaplain that Shiite Muslims are not allowed to observe their faith, like all other religions[.]

*Id.* at 10. Regarding Defendant Prack, the amended complaint states:

> Defendant Prack, knew . . . that . . . you must be present while your living area is being search for contraband, though he never listened to the hearing tape, utilizing a deceptive means to intentionally engage in surr[e]pti[t]ious conduct not becoming the [p]rofessional [c]onduct required by him under investigation of this matter.

*Id.* Regarding Defendant Hulihan, the amended complaint states:

> Defendant Hulihan, as the Superintendent was informed that I would like to be enrolled in the sex offender [p]rogram per my agreement. Defendant told me, I must discuss this with my assigned Counselor Ms. Sowhich who informed me that I would not be placed in the sex offender program until 2012. I called my attorney Mr. Bowes, as I awaited a response, the Superintendent denied my request for shite islamic study classes.

*Id.* at 11. Regarding Defendant Phillips, the amended complaint states:

> Defendant Phillips, was informed by me that I am requesting a shite

islamic study class. I submitted to [D]efendant Phillips the Statewide Shite Islamic Protocol[.] [A]t this time the[re] were three registered shite muslims.

*Id.* Regarding Defendant Connell, the amended complaint states:

Defendant Connell, created a policy and had it posted on the bullentin board in S-Dorm stating that you can not use the sink until 6 A.M. I was not allowed to make w[u]du (ab[]lution) in order to get ready for prayer. I complained to Brian Fischer and Defendant Connell yet the [p]olicy remained the same.

*Id.* Regarding Defendant Joslyn, the amended complaint states:

Defendant Joslyn knew of the policy that denied Muslims from using the sink in the morning. This practice prevented plaintiff from making wudu (ablution). I complained about this practice to Superintendent Connell who referred my letter to the defendant who did nothing to change that policy. I was not allowed to make my morning Prayer. Because I complained I had my cube searched several times as an result of wanting to practice my faith.

*Id.* at 12. Regarding Defendant Adamik, the amended complaint states:

My cube was searched three times and each time I was allowed to be pres[e]nt. It was when Offender Morrision Self-Identified as an Shi'ite Muslim Captain Adamik had Officer Sharrow search my cube on March 29, 2010 and proclaim that an **HAM CAN LID WAS FOUND UNDER PLAINTIFF'S LOCKER.** Each morning as an offender living on an sex offender dorm you must make sure that you have nothing on the floor because a staff member and two inmates check each cube to make sure that your cube is in compliance. So I know that no [h]am [c]an [l]id was sitting on the floor in front of my locker which sits [s]ix [i]nches off the floor. Captain Adamik erased a portion of my hearing tape. Defendant also knew that I should have been present when my cube was searched . . . .

*Id.* (emphasis in original). Regarding Defendant Sharrow, the amended complaint states:

Officer Sharrow was not assigned to S-Dorm Sex Offender Program. On March 29, 2010 I was at programs when . . . Officer Sharrow search[ed] my cube and state[d] that he found an [h]am [c]an [l]id on the floor of my cube. Officer Sharrow could not explain if an sex

> offender counselor just made rounds and the dorm was closed and plaintiff was at programs how did the [h]am [c]an [l]id find itself on the floor of plaintiff's cube. Officer Sharrow wrote an false [m]isbehavior [r]eport, [b]ut did not take into account that . . . I had an right to be present during this cube search.[] Officer Sharrow stated that he had no information that I was making weapons or that I was selling them to anyone. Officer Sharrow could not explain that if my cube was being frisked every 5 to 9 days why is he searching my cube now and it has not been thirty days yet. I asked Officer what information he had that made him search my cube other than to plant an [h]am [c]an [l]id and write an false misbehavior report. I got no response.

*Id.* at 13.

Attached to the amended complaint are (1) a three-page printout showing Plaintiff's disciplinary history; and (2) the Shiite Protocol. *Id.* at 15-20.

The amended complaint is now before the Court for initial review.

## II.     LEGAL STANDARD

Under 28 U.S.C. § 1915A, "[t]he court shall review . . . a complaint in a civil action in which a prisoner seeks redress from a[n] . . . employee of a governmental entity." 28 U.S.C. § 1915A(a). In conducting this review, "the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §1915A(b)(1-2) (2006). In addition, 28 U.S.C. § 1915(e) directs that when a party proceeds *in forma pauperis*, 'the court shall dismiss the case at any time if the court determines that . . . the action . . . is frivolous or malicious[,] fails to state a claim on which relief may be granted[,] or . . . seeks monetary relief against a defendant who is

immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[4]  Although the court has the duty to show

liberality towards pro se litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam),

and extreme caution should be exercised in ordering sua sponte dismissal of a pro se action,

*Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), there is a responsibility on the court to

determine that an action states a claim and that the claim is not frivolous before permitting a

party to continue proceeding *in forma pauperis*.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260

(2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint sua

sponte if the complaint is frivolous).

## III.   ANALYSIS

### A.   First Amendment Claims Regarding Shiite Classes, Books, and Locker

#### 1.   First Amendment

The Court dismissed Plaintiff's First Amendment free exercise claim regarding Shiite

classes, books, and a locker because the original complaint did not "allege facts plausibly

suggesting that Plaintiff's Shiite beliefs were substantially burdened by the lack of classes,

[books], or a locker."  (Dkt. No. 50 at 20.)  Plaintiff was granted leave to amend this claim "to

clarify the alleged misfeasance's impact on Plaintiff's free exercise of his religion."  *Id.* at 21.

The amended complaint includes far less detail about Plaintiff's First Amendment free

exercise claim regarding Shiite classes, books, and a locker than the original complaint did.  It

states only that "Defendant Phillips [] was informed by me that I am requesting a [Shiite]

[I]slamic study class.  I submitted to [Defendant] Phillips the Statewide Shi[i]te Islamic

---

[4] In determining whether an action is frivolous, the court must look to see whether the
complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325
(1989).

Protocol[.] [A]t this time the[re] were three registered [Shi]ite [M]uslims." (Dkt. No. 56 at 11.) This limited language in the amended complaint does not allege facts plausibly suggesting a substantial burden on Plaintiff's sincerely held religious beliefs. The language does not clarify the alleged misfeasance's impact on his free exercise of religion. Therefore, I recommend that the Court dismiss this claim.

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 384 (S.D.N.Y. 1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted). Here, Plaintiff has already been given an opportunity to amend his complaint. Therefore, I recommend that the Court dismiss Plaintiff's First Amendment free exercise cause of action regarding Shiite classes, books, and a locker without leave to amend.

2.     Retaliation

The Court dismissed Plaintiff's retaliation claim regarding Shiite classes, books, and a locker because the original complaint did not sufficiently allege adverse action. (Dkt. No. 50 at 22-23.) Specifically, the Court stated that "the Complaint does not allege facts plausibly suggesting that denial of Shiite classes or a locker would deter an individual similarly situated to

Plaintiff from exercising his or her constitutional rights." *Id.* at 23. Plaintiff was granted leave to amend to "clarify this allegedly unconstitutional deterrent effect." *Id.* As discussed above, the amended complaint contains almost no details about Shiite classes, books, or a locker. The facts in the amended complaint regarding these topics do not plausibly suggest that the denial of classes, books, or a locker would deter an individual similarly situated to Plaintiff from exercising his or her constitutional rights. Therefore, I recommend that the Court dismiss Plaintiff's retaliation claim regarding Shiite classes, books, and a locker without leave to amend.

### B.     Claims Regarding Denial of Non-Religious Programming

The Court dismissed Plaintiff's claim regarding the denial of non-religious programming because "[p]risoners have no constitutional right to participate in prison programs, even those that might expedite their release." (Dkt. No. 50 at 26.) Plaintiff was granted leave to amend the claim "because there is a possibility that he could state a retaliation cause of action regarding this issue." *Id.*

Regarding programming, the amended complaint states that (1) "My [a]ttorney [i]nformed Fischer's [o]ffice that I am only signing this agreement because once at Mid-State I'll be able to take the sex offender program;" and (2) "Defendant Hulihan . . . was informed that I would like to be enrolled in the sex offender [p]rogram per my agreement. Defendant told me [] I must discuss this with my assigned [c]ounselor . . . who informed me that I would not be placed in the sex offender program until 2012." (Dkt. No. 56 at 10, 11.) These bare allegations do not plausibly suggest that the denial of non-religious programming violated Plaintiff's constitutional rights. Therefore, I recommend that the Court dismiss Plaintiff's claims regarding the denial of non-religious programming without leave to amend.

## C.    Claims Regarding Transfer from Mid-State to Oneida

The Court dismissed Plaintiff's claim regarding the transfer from Mid-State to Oneida because "[i]n most cases, the transfer of a prisoner is not considered an 'adverse action.'" (Dkt. No. 50 at 28.)  Plaintiff was granted leave to amend to allege facts "plausibly suggesting that the placement at Oneida was . . . more onerous than the placement at Mid-State." *Id.* at 29.

Regarding the transfer, the amended complaint alleges only that Defendant Fischer "had no reason" to transfer Plaintiff from Mid-State to Oneida.  (Dkt. No. 56 at 10.)  This does not plausibly suggest that the placement at Oneida was more onerous than the placement at Mid-State.  Therefore, I recommend that the Court dismiss Plaintiff's claims regarding his transfer without leave to amend.

## D.    Claims Regarding Use of Sink

### 1.    Personal Involvement

The Court dismissed Plaintiff's claims regarding use of the sink because the original complaint did not allege the personal involvement of any named Defendant.  (Dkt. No. 50 at 29.)  The Court denied Plaintiff leave to amend as to Defendant Fischer but granted leave to amend as to the other Defendants. *Id.*

The amended complaint alleges that Plaintiff complained to the Sunni Islamic Chaplain about the policy prohibiting inmates from using the bathroom sink before six in the morning, and that the Chaplain informed Plaintiff that he would convey Plaintiff's complaint to Defendant Joslyn.  (Dkt. No. 56 at 7.)  The amended complaint further alleges that Defendant Connell created the policy. *Id.* at 11.  The amended complaint further alleges that Defendant Joslyn "knew of the policy that denied Muslims from using the sink in the morning.  This practice

prevented plaintiff from making wudu (ablution). I complained about this practice to Superintendent Connell who referred my letter to [Defendant Joslyn] who did nothing to change that policy. I was not allowed to make my morning Prayer." *Id.* at 12.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995) (citations omitted).[5]

Here, the amended complaint alleges that Defendant Connell created the policy regarding the use of the sink.  (Dkt. No. 56 at 11.)  Therefore, it is recommended that the Court find, for the purposes of this intial review, that the amended complaint sufficiently alleges Defendant Connell's personal involvement.

The amended complaint alleges that Defendant Connell referred Plaintiff's letter of complaint to Defendant Joslyn, who "did nothing to change that policy."  *Id.* at 12.  When the court has a full evidentiary record before it, evidence that a supervisor received letters of complaint from an inmate and failed to respond is generally insufficient to establish personal involvement.  *See Shomo v. City of New York*, 579 F.3d 176, 184 (2d Cir. 2009).  However, the Second Circuit has recently cautioned courts against dismissing claims before the summary judgment stage for failure to allege personal involvement where the plaintiff alleges that an official failed to respond to a letter of complaint.  *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) ("At the pleading stage, even if Grullon had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference . . . that the Warden in fact received the Letter, read it, and thereby became aware of the alleged conditions of which Grullon complained.").  Therefore, it is

---

[5]     In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies.  The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories.  Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories.  *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  I will assume for the purposes of this motion that *Colon* remains good law.

recommended that the Court find, for the purposes of this initial review, that the amended

complaint sufficiently alleges Defendant Joslyn's personal involvement.

        2.    <u>Merits</u>

The amended complaint alleges that Defendants Connell and Joslyn violated Plaintiff's

right to exercise his religion by denying him access to the sink for pre-prayer ablution.  This

claim could be construed as arising under both the First Amendment Free Exercise Clause and

the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  For the reasons

discussed below, I recommend that the Court direct Defendants Connell and Joslyn to respond to

the First Amendment claim and dismiss the RLUIPA claim without leave to amend.

        a.    *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion

guaranteed by the First Amendment.  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be

balanced against the interests of prison officials engaged in the complex duties of administering

the penal system.  *Id*.  Thus, a prison regulation or individualized decision to deny a prisoner the

ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than

that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a

[prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate

penological interests."  *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone

v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the

disputed conduct substantially burdens[6] his sincerely held religious beliefs." *Salahuddin*, 467

F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). A religious belief is "sincerely held" when the

plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352

F.3d at 590. Here, the amended complaint alleges that the policy prohibiting use of the sink

before 6:00 a.m. prevented Plaintiff from making ablution to prepare for morning prayer. (Dkt.

No. 56 at 11.) Although this allegation is somewhat cursory, I recommend that the Court find for

the purposes of this initial review that the complaint alleges facts plausibly suggesting that

Plaintiff sincerely holds a belief that he must wash before morning prayer.

A prisoner's sincerely held religious belief is "substantially burdened" where "the state

puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly*

*v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996) (punctuation omitted) (holding that Rastafarian

prisoner's sincerely held religious belief that he was prohibited from submitting to a test for

latent tuberculosis was "substantially burdened" where he was forced to choose between

"submitting to the test or adhering to [his] beliefs and enduring medical keeplock."). Here, the

amended complaint alleges that Plaintiff was entirely denied access to the sink before morning

---

[6]       Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement, because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008)(citations and some punctuation omitted).

prayer. (Dkt. No. 56 at 11.) I recommend that the Court find, for the purposes of this initial review, that the amended complaint alleges facts plausibly suggesting that the lack of access to the sink substantially burdened Plaintiff's sincerely held religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted). Here, Defendants have not yet responded to Plaintiff's First Amendment free exercise claim and, accordingly, have not identified a legitimate penological interest justifying their denial of Plaintiff's access to the sink before morning prayer. Accordingly, I recommend that the Court allow Plaintiff's First Amendment free exercise claim to survive this initial review and direct Defendants to respond to the claim.

b.    *RLUIPA*

Plaintiff's claim regarding access to the sink also implicates RLUIPA. RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[7] . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a) (2012). RLUIPA does not authorize monetary damages against state officers in

---

[7]    An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia*, "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

their official capacities. *Sossamon v. Texas*, 131 S. Ct. 1651 (2011). In addition, the Second

Circuit has recently held that RLUIPA does not create a private right of action against state

officers in their individual capacities. *Washington v. Gonyea*, __ F.3d __, No. 11-980-cv, 2013

U.S. App. LEXIS 18759, 2013 WL 4792375 (Sept. 10, 2013) (per curiam).[8] Here, although

Plaintiff has requested injunctive relief (Dkt. No. 56 at 14), his request for injunctive relief

regarding his right to practice his faith at Oneida Correctional Facility is moot because he is no

longer housed there. (Dkt. No. 65.) "In this circuit, an inmate's transfer from a prison facility

generally moots claims for declaratory and injunctive relief against officials of that facility."

*Salahuddin*, 467 F.3d at 272 (citations omitted). Therefore, I recommend that the Court dismiss

Plaintiff's RLUIPA claim without leave to amend.

### E.     Claims Regarding Can Lid Misbehavior Report

The Court dismissed Plaintiff's claims regarding the can lid misbehavior report as barred

by the rules in *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Edwards v. Balisok*, 520 U.S. 641

(1997). (Dkt. No. 50 at 31-33.) Plaintiff was granted leave to amend if he agreed "to abandon

any and all claims he has with respect to the loss of good time credits." *Id.* at 33. The amended

complaint alleges that it made "no sense" for Defendant Adamik to impose a loss of good time

credits on Plaintiff "because plaintiff has no goodtime to lose." (Dkt. No. 56 at 7.) However,

Plaintiff has not explicitly agreed to abandon any and all claims he has with respect to the loss of

good time credits. Therefore, I recommend that the Court dismiss Plaintiff's claims regarding

the cell search, the misbehavior report, and the disciplinary hearing without leave to amend.

---

[8]     The Court will provide Plaintiff with a copy of this decision in accordance with
the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**ACCORDINGLY**, it is

**RECOMMENDED** that the Court dismiss the following claims without leave to amend: (1) the First Amendment free exercise claim regarding Shiite classes, books, and a locker; (2) the retaliation claim regarding Shiite classes, books, and a locker; (3) the claim regarding denial of non-religious programming; (4) the claim regarding Plaintiff's transfer from Mid-State to Oneida; (5) the claims regarding the cell search, misbehavior report, and disciplinary hearing; and (6) the RLUIPA claim regarding use of the sink at Oneida Correctional Facility; and it is further

**RECOMMENDED** that the Court allow Plaintiff's First Amendment free exercise claim regarding use of the sink at Oneida Correctional Facility to survive initial review and direct Defendants Connell and Joslyn to respond to that claim as provided in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Washington v. Gonyea*, __ F.3d __, No. 11-980-cv, 2013 U.S. App. LEXIS 18759, 2013 WL 4792375 (Sept. 10, 2013) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72.

Dated: November 4, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge